**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Heraeus Medical GmbH,

        Plaintiff,

    v.

Esschem, Inc.,

        Defendant.

Civil Action No. 2:14-cv-05169-CMR

**PLAINTIFF HERAEUS MEDICAL GMBH'S SUPPLEMENTAL BRIEF
IN SUPPORT OF RENEWED MOTION TO EXCLUDE EXPERT TESTIMONY
AT THE PRECLUSION HEARING**

Plaintiff, Heraeus Medical GmbH ("Heraeus") hereby renews its motion to exclude

expert testimony that Esschem, Inc. ("Esschem") seeks to present at the upcoming preclusion

hearing.  On February 11, 2016, Heraeus filed its motion to exclude certain testimony at the

preclusion hearing.  (Dkt. No. 189.)  The motion was fully briefed.  (Dkt. Nos. 196 and 199).  On

March 8, 2016, this Court granted the motion as to the testimony of Mr. Schneider, Heraeus' in-

house counsel, and denied the motion without prejudice as premature as to the legal and

technical expert testimony that Esschem seeks to present, because expert reports had not yet been

submitted.  (Dkt. No. 202.)  On March 9, 2016, Esschem produced the expert reports of Dr.

Stuart Cooper and Prof. Dr. Mary-Rose McCue McGuire, submitted herewith as Exhibits A and

B, respectively.  These reports confirm what Heraeus expected—that Esschem's proposed

testimony is not relevant to the issues to be presented at the upcoming preclusion hearing, but

rather is intended to mount an improper collateral attack on the German Judgment.  Accordingly,

Heraeus renews its motion and asks this Court to exclude Esschem's proposed legal and

technical expert testimony.

In its motion, Heraeus showed that Esschem should not be permitted to present legal or technical expert testimony.  Heraeus seeks a ruling that certain findings made by the German court as a matter of German law are preclusive—that Heraeus possesses protectable trade secrets, that the trade secrets were adequately safeguarded, that Biomet misappropriated those trade secrets in Germany, and that Biomet used those trade secrets to guide Esschem in the development of R262 and R263.  In R&R No. 5, this Court determined that discovery into technical issues is not necessary until the preclusive effect of the German Judgment is decided. (*See* R&R No. 6, Dkt. No. 188, at 3 (stating that the Special Master is "inclined to agree" that technical expert testimony is "beyond the scope of the limited upcoming hearing, for the reasons set forth at length in R&R No. 5.").)  Nor is legal expert testimony relevant to the issues that will be considered at the preclusion hearing.  Heraeus showed that Third Circuit precedent holds that the binding effect of the German Judgment is an issue of United States law, and this Court is the final arbiter of the United States law.  Applying that precedent, the issues decided in the Judgment are questions of German law.  This Court does not need an expert to explain German law when the German courts themselves have already determined the relevant law and ruled based upon that law.  Esschem's expert reports confirm that Esschem really seeks to introduce expert testimony to collaterally attack the German Judgment.  The proposed testimony has no relevance to the issues that will be determined at the upcoming hearing.  Esschem's proposed expert testimony should be excluded.

### Testimony of Dr. Cooper—Esschem's Technical Expert

Dr. Cooper's expert report shows that he intends to offer two opinions:  1) that Esschem is allegedly not using Heraeus' trade secrets, based upon his analysis of certain data regarding Esschem's R262 and R263 copolymers, and 2) that Heraeus' trade secrets have supposedly not been adequately protected.  (Exh. A at ¶ 8.)  Neither of those two opinions has anything to do

with the limited issues of collateral estoppel and privity to be presented at the upcoming

preclusion hearing.  (Dkt. No. 181 at 1.)  Despite Esschem's attempt to characterize Dr. Cooper's

opinion as "foundational," the testimony is obviously intended to 1) mount a collateral attack on

the Judgment by trying to undermine the German court's conclusion that Heraeus' trade secrets

were adequately protected, and 2) defend against Esschem's ultimate liability for

misappropriation.[1]  Neither of these topics is appropriate for the preclusion hearing.  Indeed, the

whole point of having the preclusion hearing is to determine the extent that the Judgment is

binding on Esschem and to *avoid* unnecessary discovery and litigation over technical issues.  If

the findings in the Judgment are binding, Esschem's position that the German court "got it

wrong" with respect to technical issues is irrelevant.  And, while Heraeus disagrees that Dr.

Cooper's analysis of R262 and R263 is probative of the issue of Esschem's liability, the time for

the Court to consider those opinions, if at all, is after resolution of the preclusion issues.  Finally,

Esschem attempts to inject this improper evidence into the preclusion hearing by linking Dr.

Cooper's technical opinions to Prof. McGuire's legal opinions.  Notably, Dr. Cooper's opinions

analyzing technical aspects of the Esschem copolymers and alleged disclosure of Heraeus trade

secrets have no relationship to Prof. McGuire's opinions about German law.  Moreover, Prof.

McGuire's report ignores that much of this evidence was presented in the German procieedings

and provides no reason why either Biomet or Esschem could not have presented any of this

evidence in the German proceedings that may not have been presented there.  Thus, Dr. Cooper's

---

[1] Even if Dr. Cooper were correct that R262 and R263 have properties outside the limits of certain of Heraeus' specifications—a point Heraeus very much doubts and that is, in any event, not properly part of the preclusion analysis—Esschem would still be liable for trade secret misappropriation, as the Heraeus trade secrets were used to guide Esschem's development of R262 and R263.  *See, e.g., Merck & Co. v. SmithKline Beecham Pharms Co.*, No. 15443–NC, 1999 WL 669354, at *20 (Del. Ch. Aug. 5, 1999) ("Misappropriation occurs even where the trade secret is used only as a starting point or guide in developing a process."); *Reinforced Molding Corp. v. Gen'l Elec. Co.*, 592 F. Supp. 1083, 1088 (W.D. Pa. 1984) (finding defendant liable for trade secret misappropriation when it "utilized Plaintiff's process as a starting point to its own manufacture of the [accused] part").

opinion is not properly foundational matter. Moreover, Prof. McGuire's opinions are equally improper and should also be excluded. If Prof. McGuire's testimony is excluded, as it should be, that decision will obviate any need for "foundational" testimony from Dr. Cooper.

### Testimony of Prof. McGuire—Esschem's Foreign Law Expert

As discussed more specifically below, the theories and nuances of German law that Prof. McGuire describes are irrelevant to the issues before this Court. But in any event, the theories in Prof. McGuire's report appear in many respects to be her personal observations, rather than descriptions of established German law. Heraeus' legal experts are prepared to refute Prof. McGuire's conclusions and will state that even if German law were relevant here, Prof. McGuire's opinions about German law are either irrelevant to the preclusion inquiry at issue or simply wrong. The critical point of this motion, however, is that Heraeus has obtained a Judgment of the Frankfurt Court of Appeals, and none of Prof. McGuire's opinions about German law, reciprocity, unfair competition, and extraterritorial effect is relevant to the preclusion inquiry, which is indisputably a question of U.S. law.

Legal expert testimony is neither necessary nor appropriate at the preclusion hearing because Third Circuit and Pennsylvania law govern the determination of whether and to what extent the German Judgment will be given preclusive effect. This Court does not need an expert to testify about Third Circuit or Pennsylvania law: "Each courtroom comes equipped with a 'legal expert,' called a judge[.]" *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5766930, at *2 (E.D. Pa. Aug. 20, 2015). Further, the determination of whether Heraeus possesses protectable trade secrets and whether they were misappropriated by Biomet is a matter of *German* law. *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 268 (3d Cir. 2000) (reversing district court for applying New Jersey trade secret law instead of Taiwanese law where Taiwan had the greater interest in determining whether trade secrets

developed in Taiwan pursuant to Taiwanese law were protected trade secrets). Those issues of German law have been fully decided by the Frankfurt Court of Appeals. *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 442 (3d Cir. 1971) (finding foreign judgment binding); *see also Belize Telecom Ltd. v. The Government of Belize*, 528 F.3d 1298,1308-09 (11th Cir. 2008) (reversing for abuse of discretion when district court "refus[ed] to defer to the Belizean judgment"). Because of the existence of the German Judgment, this case is unlike those cited by Esschem where a foreign law expert was necessary or helpful to determine the content of foreign law. The German court has already provided that determination.

Prof. McGuire's expert report shows that she intends to present a complicated discussion of German law and procedure, all of which is entirely irrelevant. Prof. McGuire's opinions on the differences between German and U.S. law have no bearing on the preclusion issue. (Exh. B at ¶¶ 9, 17-21, 41-83, 106-110.) Heraeus is asking the Court to give preclusive effect to findings of the German court rendered as a matter of German law. That German trade secret law may have a somewhat different doctrinal basis than U.S. trade secret law may be academically interesting, but it has no bearing on the issues in this case. According to controlling Third Circuit precedent, German law controls the questions of whether Heraeus possesses protectable trade secrets, whether those secrets were adequately protected, and whether Biomet misappropriated and used those secrets to guide Esschem's development of R262 and R263. The German court has fully considered those issues as a matter of German law and ruled on them. Any quibbling over whether a U.S. court might consider the issue differently is irrelevant. Moreover, allowing Esschem to present such evidence would allow Esschem to mount an improper collateral attack on the German Judgment.

Similarly, Prof. McGuire's academic and hypothetical opinions about how a German court would respond to a U.S. court's judgment if the roles were reversed is irrelevant. (Exh. B

at ¶¶ 13, 99-105.)  The Third Circuit's decisions in *BP Chems.,* 229 F.3d at 268 and *Somportex*,

453 F.2d at 440, instruct this Court to apply German law to the issues in this case.  The

hypothetical situations discussed in Prof. McGuire's report are not before this Court.  Instead,

Prof. McGuire's report suggests that Esschem is attempting to inject some kind of reciprocity

requirement into the preclusion analysis, but, as Heraeus showed, reciprocity is simply irrelevant

to comity under the controlling law.  *Somportex*, 453 F.2d at 440 n.8 (explaining that the so-

called reciprocity principle of *Hilton v. Guyot* as a condition precedent to the recognition of

comity "has received no more than desultory acknowledgement" and is not "an essential

precondition to their enforcing a foreign judgment."); *accord Gabbanelli Accordions & Imports,*

*L.L.C. v. Gabbanelli*, 575 F.3d 693, 697 (7th Cir. 2009) (noting that "American courts apply the

American doctrine of res judicata even to a foreign judgment of a nation . . . that would not treat

an American judgment the same way").

Prof. McGuire's opinions about German preclusion law and of the enforceability of the

German Judgment in other countries is also irrelevant.  (Exh. B at ¶¶ 11-12, 92-98.)  Whether

this Court will accord the Judgment preclusive effect is a question of Third Circuit and

Pennsylvania law, not German law.  Prof. McGuire offers opinions about preclusion law and

makes technical distinctions between what we call res judicata and collateral estoppel.  (*Id*.)  She

opines about whether collateral estoppel and non-mutual issue preclusion apply under German

law.  (*Id*.)  While, again, this discussion may be academically interesting , it has no bearing here

because Third Circuit and other relevant U.S. law is clear that U.S. courts apply U.S. preclusion

law to determine the preclusive effect of a foreign judgment.  Rather than undertake the

extremely difficult and time and resource consuming task of determining nuances of a foreign

country's preclusion law, U.S. courts generally give foreign judgments preclusive effect absent

some showing that the forum was inadequate to resolve the dispute or the decision was the

product of gross impropriety, such as fraud or bribery. *Derr v. Swarek*, 766 F.3d 430, 438-39

(5th Cir. 2014) ("If an otherwise valid judgment is rendered in a foreign court, the merits of the

case will not be re-litigated if 'there is nothing to show either prejudice in the court, or in the

system of laws under which it was sitting, or fraud in procuring the judgment, or any other

special reason why the comity of this nation should not allow it full effect.'"); *Air-Prods. &*

*Chems., Inc. v. Inter-Chem., Ltd*., No. 03-CV-6140, 2005 WL 196543, at *7 (E.D. Pa. Jan. 27,

2005) (explaining that deference to a German court's preliminary injunction decision would be

appropriate as a matter of international comity when ruling on a motion for a preliminary

injunction in the U.S. to stop defendant from using plaintiff's trade secrets).

  Prof. McGuire also goes into a lengthy academic discussion of the circumstances when

German judgments have extraterritorial effect in other countries.  (Exh. B at ¶¶ 12, 16, 84-91,

111-114.)  That issue has no bearing on this case.  Heraeus is not trying to directly apply or

enforce the remedies imposed by the German Judgment on Esschem.  All Heraeus is trying to do

is obtain a determination that certain elements and findings made by the German court have

preclusive effect in this case, which is governed by U.S. preclusion law, not foreign enforcement

law.  More importantly, because the enforceability of any foreign judgment in a U.S. court would

be determined by U.S. law, not foreign law, Prof. McGuire's theories about German law are

irrelevant in any case.

  Finally, Prof. McGuire's opinion that the claims in Germany and in this case are

somehow different to avoid application of preclusion is wrong as a matter of controlling U.S. law

and should not be admitted.  (Exh. B at ¶¶ 9, 14, 15, 17-40, 81-83.)  As Heraeus showed, the

inquiry for collateral estoppel purposes is whether the issues are "in substance" the same:

> Even if there was not a precise identity of the 'causes of action'
> asserted, it would be of no legal consequence; there is no such
> requirement for the application of issue preclusion. Only the issues
> need be the same.  And in this case, the issues were "in substance

the same" as that which the Witkowskis press to litigate once again.

*Witkowski v. Welch,* 173 F.3d 192, 203 (3d Cir. 1999) (internal citations omitted); *see also Prusky v. ReliaStar Life Ins. Co*., 532 F.3d 252, 266 (3d Cir. 2008) (affirming application of collateral estoppel and rejecting appellant's "overly-narrow characterization of the particular legal questions at issue in the two proceedings" where "the same legal issue . . . was nevertheless at the heart of both actions").  It is indisputable that the issues for which Heraeus seeks preclusive effect are that Heraeus possesses protectable trade secrets, that the trade secrets were adequately safeguarded, that Biomet misappropriated those trade secrets in Germany, and that Biomet used those trade secrets to guide Esschem in the development of R262 and R263.  Prof. McGuire's quarrels about the similarities or differences between U.S. and German law simply do not change the issues under consideration.

## CONCLUSION

For all these reasons, this Court should preclude Esschem from presenting Dr. Cooper's and Prof. McGuire's testimony at the preclusion hearing.

March 15, 2016                                          Respectfully submitted,

                                                /s/ Susan M. Gerber
                          Samuel W. Silver (Pa. No. 56596)
                          John R. Timmer (Pa. No. 89814)
                          Schnader Harrison Segal & Lewis LLP
                          1600 Market Street, Suite 3600
                          Philadelphia, PA 19103-7286
                          Phone:  (215) 751-2309
                          Fax:     (215) 751-2205

                          Lawrence D. Rosenberg (Pa. Bar No. 67414)
                          JONES DAY
                          51 Louisiana Avenue, NW
                          Washington, DC  20001
                          Phone:  (202) 879-3939
                          Fax:     (202) 626-1700

                          Susan M. Gerber (Ohio Bar No. 0070945)

JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH  44114
Phone:  (216) 586-3939
Fax:      (216) 579-0212

Attorneys for Plaintiff
Heraeus Medical GmbH

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2016, I caused a true and correct copy of the foregoing *Plaintiff Heraeus Medical GmbH's Supplemental Brief In Support Of Renewed Motion To Exclude Expert Testimony At The Preclusion Hearing* to be filed upon all counsel of record by operation of the Court's ECF system.  The confidential version of Exhibit A has been manually filed under seal, and service of Exhibit A was accomplished by email as required by the parties' service agreement, and to mkornak@freeborn.com.


                       /s/ Susan M. Gerber
                       Susan M. Gerber

# EXHIBIT A
# FILED UNDER SEAL

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HERAEUS MEDICAL GMBH, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 2:14-cv-05169-CMR |
| | ) | |
| v. | ) | The Honorable Cynthia M. Rufe |
| | ) | |
| ESSCHEM, INC., | ) | Special Master David H. Marion |
| | ) | |
| *Defendant*. | ) | |

## <u>EXPERT REPORT OF PROF. DR. MARY-ROSE McCUE McGUIRE</u>

**TABLE OF CONTENTS**

I.     BACKGROUND .................................................................................................. 1
   A.  Introduction ................................................................................................. 1
   B.  Qualifications ............................................................................................. 1
   C.  Materials Considered ................................................................................. 2
   D.  Compensation ............................................................................................. 2
II.    EXECUTIVE SUMMARY ................................................................................. 2
III.   RELEVANT DIFFERENCES BETWEEN TRADE SECRET PROTECTION UNDER
      GERMAN LAW AND U.S. LAW ..................................................................... 4
IV.   THE TWO LAWSUITS CANNOT QUALIFY AS THE SAME CAUSE OF ACTION
      WITH IDENTICAL ISSUES ............................................................................. 5
   A.  Cross-Border Element ................................................................................ 5
   B.  Principle of Territoriality as a Starting Point (Art. 39 TRIPS Agreement)...... 5
   C.  Germany's Competition Law-Based Approach to Trade Secret Protection ...... 6
   D.  Determination of the Law Applicable to Non-Contractual Obligations Arising Out of
       Unfair Competition under German Conflicts of Law Rules .............................. 6
   E.  The Law Applicable to the Alleged Acts of Esschem ............................... 7
V.    THE GERMAN JUDGMENT WAS RENDERED UNDER DIFFERENT LEGAL
      STANDARDS THAN THOSE APPLICABLE TO THE PENNSYLVANIA ACTION.. 10
   A.  Lack of Identical Issues ............................................................................. 10
   B.  EU and German Trade Secret Protection ................................................. 10
     1.  Trade Secrets in the EU ...................................................................... 10
     2.  Trade Secrets under German Law ....................................................... 11
     3.  The Most Significant Sources of Trade Secret Protection in German Law are Found in
       the Criminal Provisions of the Act Against Unfair Competition.................. 13
     4.  German Law Recognizes Two Categories of Trade Secrets: Industrial Secrets
       (Betriebsgeheimnis) and Commercial Secrets (Geschäftsgeheimnis)............ 14
     5.  The Four Requirements for Trade Secret Protection Under German Law .......... 15
       a.  Not in the Public Domain ............................................................. 15
       b.  Connected with a Particular Business ......................................... 17
       c.  The Owner Must Have the Intention to Keep the Information Secret ......... 17
       d.  The Business Has an Economic Interest in Keeping the Information Secret .......... 18
VI.   CLAIMS BASED ON DIFFERENT ACTS BY DIFFERENT PARTIES CANNOT
      QUALIFY AS THE SAME CAUSE OF ACTION ........................................... 19
VII.  THE GERMAN JUDGMENT IS NOT ENTITLED TO EXTRA-TERRITORIAL
      EFFECT .............................................................................................................. 19
   A.  The German Injunction Has No Extra-Territorial Effect................................ 19
   B.  Res Judicata Under German Law Is Limited To Only the Court's Ruling on Specific
       Claims.......................................................................................................... 22
VIII. RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN
      GERMANY ...........................................................................................…………23
   A.  Standard for Recognition and Enforcement of U.S. Judgments in Germany ......... 23
   B.  Procedural Differences Between Germany and the U.S. ............................. 23
   C.  There Are Significant Differences Between German and U.S. Trade Secret Law In
       Reverse Engineering ................................................................................. 25

IX.   THE FRANKFURT JUDGMENT SHOULD NOT IMPACT THE PENNSYLVANIA
      COURT'S ASSESSMENT OF HERAEUS' TRADE SECRET CLAIM AGAINST
      ESSCHEM ............................................................................................................... 26
X.    CONCLUSION ......................................................................................................... 26

## I.      BACKGROUND

### A.      Introduction

1.      My name is Mary-Rose McCue McGuire.  I was asked by Esschem's counsel to: identify and describe the differences between trade secret protection in Germany versus that in the United States; review and provide my opinion as to whether the injunction entered in the German judgment in the German unfair competition action between Heraeus and Biomet, among other defendants, is effective outside of Germany; and review and provide my opinion as to how the issues and claims decided in the German judgment compare to the issues and claims raised by Heraeus Medical GmbH (Heraeus) in its United States lawsuit against Esschem, Inc. (Esschem).

### B.      Qualifications

2.      I am a law professor at the University of Osnabrück, Germany.  I was first appointed as a Full Professor in 2010 at the University of Mannheim and transferred to the University of Osnabrück in the fall term of 2015.  Presently, I hold the chair for Private Law, Intellectual Property Law and German and International Civil Procedure.  My concentration and main areas of research are cross-border-litigation including conflict of laws, on the one hand, intellectual property law, on the other.

3.      My expertise in the area of cross border litigation developed from my doctoral thesis on *lis pendens* and limitation of action (2004), which *inter alia* touches on *lis pendens*, recognition and enforcement of foreign judgments.  Subsequently I have engaged in several research projects in the area of European and international civil procedure, such as a study commissioned by the European Commission on 'Documentary Disclosure in Cross Border Litigation'.  Published papers in this area further include the European Regulation on the Taking of Evidence and the Directive on Enforcement of Intellectual Property Rights.  Further I have recently written a commentary on Art. 8 Rome-II-Regulation and the law applicable to extra-contractual obligations.  Starting in 2010 I have taught courses covering the full range of civil procedure (German civil procedure, European civil procedure, arbitration, conflict of laws) both at the university level and in professional continuing education for certified solicitors.

4.      My interest in the area of intellectual property law was spiked by the research on my professorial thesis on license contracts (completed in 2009, published 2012) and the participation in a major research project developing a 'Model Law on Intellectual Property' (published 2011/2012).  The main area of my research in this field concerns the interplay of intellectual property (IP) and competition law, on the one hand, with the general statutes, such as the Civil Code, Civil Procedure Code and the European regulations on jurisdiction and conflicts of law, on the other.  Apart from license contracts the legal nature and protection of know-how (trade secrets) have been of central interest for me.  In this regard I have acted as the German reporter to the International Association for the Protection of Intellectual Property Law (AIPPI) and I drafted and translated recent German reports on know-how protection AIPPI Q 215, 'Protection of trade secrets through IPR and unfair competition law'; and Q 247 on 'Trade Secrets: Overlap with restraints of trade, aspects of enforcement.' The latest paper on protection of trade secrets (*published in the law journal of the German Association for the Protection of*

*Intellectual Property, GRUR 2015, 424*) concerns the topic of the upcoming EU Trade Secret Directive as a welcome impulse for law reform in Germany. The research areas mentioned are mirrored by my teaching activities at the University of Osnabrück, Mannheim Business School and GRUR-Seminars (introduction to IP-law, patent, trademark and unfair competition law as well as IP in conflict of laws).

5.    Exhibit A is a copy of my current curriculum vitae ("CV"), which sets out my experience in further detail, including a list of my publications and previous matters during the previous four years in which I have provided expert opinions.

### C.    Materials Considered

6.    In preparing this Report and formulating my opinions, I have reviewed the materials cited herein and those listed in Exhibit B to this Report.  At trial, deposition, or in any supplemental report, I may use all or a portion of the documents reviewed and relied upon for this Report, including possibly other visual aids, charts, or exhibits.

### D.    Compensation

7.    I have been retained by Esschem, through its counsel at Greenberg Traurig LLP and I am being compensated at the rate of €300 per hour for my work.

## II.    EXECUTIVE SUMMARY

8.    My testimony is based on my expertise as a German law professor; my previous research and publications concerning both the protection of trade secrets under German law and European civil procedure respectively.

9.    I have concluded that there are several differences between trade secret protection provided under German unfair competition laws and those provided under the Pennsylvania Uniform Trade Secret Act (PUTSA) and that the case between Heraeus and Esschem now before the Federal District Court for the Eastern District of Pennsylvania would be governed by U.S. law, whereas the Frankfurt court adjudicated the dispute between Heraeus and Biomet under German law.  I have further concluded, and that the effect of the German judgment is restricted to the parties that participated in the Frankfurt proceedings and that the injunction provided in the German judgment is geographically restricted to activities in Germany.  The case decided by the Higher Regional Court of Frankfurt, Germany, and the subject matter in dispute now pending before the United States District Court in Pennsylvania are different causes of action that raise different issues.  On the basis of the aforementioned, I would not expect a German court to recognize an injunction entered by a court in Pennsylvania, if the circumstances were reversed.

10.    I understand that Heraeus Medical GmbH ("Heraeus") is seeking to rely on a German judgment rendered against the Biomet Group by the Frankfurt Court of Appeal on June 5th, 2014 in a lawsuit between Heraeus and Esschem that is before the Federal District Court for the Eastern District of Pennsylvania.  I further understand that Esschem was not a party to the German proceeding that led to the German judgment.

2

11.     German procedure law does not recognize the principle of issue preclusion or collateral estoppel.  Thus, a German court would not apply issue preclusion as a result of any prior proceeding–regardless of whether it took place in a U.S. court or a German court.  Thus, Heraeus' German judgment against Biomet would have no preclusive effect on a subsequent action by Heraeus against Esschem asserting the same trade secrets in a German court.

12.     It is important to emphasize that, at a minimum, under German law and my understanding of that in the United States, a decision of a foreign court will not be given extraterritorial effect beyond that to which the ruling is intended to have such extraterritorial effect by its jurisdiction of origin.  In Heraeus' German action against *inter alia* Biomet, the German court rendered a judgment on the basis of alleged facts that took place in Germany and adjudicated Heraeus' trade secret misappropriation claims exclusively under German law.  The German judgment grants Heraeus compensation for acts that have affected it in the German market and the injunction is directed solely against future acts in Germany.  This strongly indicates that the finding of the German court should not be applied to persons or acts outside of Germany.

13.     As recognition and enforcement of court judgments between the U.S. and Germany are based on the principle of reciprocity, the Pennsylvania Court may consider it highly relevant whether a German court would recognize any binding effect of a U.S. judgments if the tables were turned.  From the perspective of German law, a judgment only has a binding effect for purposes of subsequent proceedings (*res judicata*) if it meets three cumulative requirements: (a) the claim must be based on the same cause of action, (b) the judgment must be rendered between the same parties and (c) the issues at stake must be covered (or addressed) by the operative parts of the judgment.  In my opinion, none of these requirements is met with respect to Heraeus' attempt to apply the German judgment against Esschem in the Pennsylvania lawsuit.

14.     First, the German decision is only relevant if it is based on the same cause of action, *i.e.* it is evaluated under the same applicable law (*see below III.*) and concern the same facts (*see below VI.*).  The law governing trade secrets in Germany is very different than my understanding of the PUTSA that governs the pending case between Heraeus and Esschem.  On the one hand, because the acts under review before the German court were the *divulgence* of trade secrets in Germany by Biomet, whereas the subject matter of the complaint in the U.S. is the *access and use* of trade secrets by Esschem.  German law does not acknowledge or protect trade secrets as a property right, but rather protects persons and companies against specific acts of trade secret misappropriation, which are considered dishonest or unfair competitive practices.  Therefore, the appraisal of whether divulgence by Biomet is unlawful rests on entirely different objective and subjective criteria as compared to the mere use by Esschem. In addition, the parties to the present U.S. dispute are corporations based in different jurisdictions.  This raises the question of which substantive law applies.  Although not explicitly mentioned in the complaint before the German court, those entire proceedings were obviously conducted under German law as the *lex causae*. Heraeus' complaint in the dispute against Esschem before the Eastern District Court of Pennsylvania indicates it is based on the PUTSA.  Thus two different laws apply to the two cases, which have fundamentally different requirements. A German court ruling on the dispute now before the Pennsylvania Court would not be bound by a prior German decision rendered in the dispute between Hereaus and Biomet.  Accordingly, I would not expect the findings relating to German law to have a binding effect on the U.S. proceedings.

3

15. Second, the German judgment could only be authoritative for any second set of proceedings, such as that now before the U.S. court, if the parties are identical (*see below V.*). In Germany, like the U.S., the parties and the respective cause of action are defined by the statement of facts and the relief sought in the plaintiff's complaint. The statement of facts provided by Heraeus in the German court proceeding only covers the alleged disloyal use and disclosure of trade secrets by members of the Biomet Group and other individuals. There are no factual allegations directed against Esschem. In contrast, Heraeus' U.S. complaint is based on the allegation that Esschem somehow gained illicit access to a trade secret possessed by Heraeus. However, using, disclosing and gaining access are not only separate acts, but also by definition they are committed by different entities and may give rise to different remedies. Therefore, Heraeus' allegation of disloyal disclosure and use of its trade secrets against Biomet and the allegation of dishonest access to those same trade secrets against Esschem cannot qualify as complaints against the same parties under German law.

16. Third, the scope of the German judgment was not intended to have effect in the U.S. (*see below VI.*) It is a generally acknowledged principle that a judgment cannot have any broader effect in a foreign tribunal than it has in its jurisdiction of origin. German law of unfair competition is intended to regulate the German market and therefore is held to have a so-called self-restricting quality. An injunction based on German law of unfair competition therefore, as a general rule, only is effective in Germany. But even if the judgment could be construed to have extra-territorial effect, any recognition and enforcement could only extend as far as the German judgment has effect in Germany. Under the German doctrine of *res judicata,* only the operative part of a judgment is binding and only on the parties actually participating in the lawsuit are bound. As noted above, the concept of *issue preclusion* is not recognized under German law. Further, any *res judicata* effect requires that no ordinary appeal is allowed or pending. The German judgment that Heraeus seeks to apply in the U.S. therefore does not (yet) have any such effect because it is the subject of a pending appeal. In addition, despite international comity no country is obliged to accept a result contrary to fundamental values of its own legal system. In this respect, the different concepts both of trade secret protection and the administration of justice (taking of evidence) between Germany and the U.S. (Pennsylvania) are of relevance.

## III.   RELEVANT DIFFERENCES BETWEEN TRADE SECRET PROTECTION UNDER GERMAN LAW AND U.S. LAW

17. To support the above statement I will discuss and show that the case decided by the Higher Regional Court of Frankfurt, Germany, and the subject matter in dispute now pending before the United States District Court in Pennsylvania are different causes of actions that raise different issues.

18. First, the trade secret protection laws of the two jurisdictions are significantly different: Heraeus action against Biomet in Germany was governed by German competition law, which focuses on regulating certain commercial conduct, whereas Heraeus' action against Esschem in Pennsylvania is governed by the PUTSA, which I understand treats and protects trade secrets as property rights.

19. Second, German law protects trade secrets under an entirely different regulatory

technique than that used by the PUTSA. Thus neither the appraisal of the facts nor the legal conclusion of the German court can indicate whether any of those same alleged acts would be unlawful under U.S. law. Even the preliminary question of whether the information in question qualifies as a trade secret has been decided by different standards, which are apparently more generous to Heraeus under German law than under my understanding of the PUTSA.

20.     Third, under German unfair competition law the accusation must be based on the particular act of a particular person. The German claim was based on the *divulgence* by Biomet and naturally the claim was brought against the Biomet group. The U.S. claim by contrast is based on the alleged acquisition of such trade secret by Esschem and was brought solely against Esschem. However, the German judgment on the former claim naturally does not decide on the latter.

21.     Fourth, German unfair competition law is based on an appraisal of interests undertaken by the German legislator and intended to regulate the German market. Naturally then a judgment rendered on the basis of the German Unfair Competition Act claims authority for exactly this German market. It would exceed the intended scope of such judgment if the operative part of the ruling would be applied to other markets. In addition, a comparison with the upcoming EU-Directive displays that German law takes a particularly old-fashioned approach, focusing on the protection of German companies as opposed to balancing innovation and competition. This explains the predominant reservation regarding reverse engineering, but at the same time makes it highly questionable whether this assessment recommends itself for recognition abroad.

## IV.   THE TWO LAWSUITS CANNOT QUALIFY AS THE SAME CAUSE OF ACTION WITH IDENTICAL ISSUES

### A.     Cross-Border Element

22.     The parties to the present dispute have their principal places of business in different countries. Heraeus Medical GmbH is incorporated under German law with its main seat in Wehrheim, Germany. Esschem is a company incorporated under U.S. law with its registered and main seat in Linwood, Pennsylvania. Heraeus is relying on the findings of a German court in a U.S. proceeding. These dominant cross-border elements raise the question which law is applicable to the issues in dispute. The following conflict of law analysis is of particular relevance, as the law on the protection of trade secrets despite current efforts on harmonization – such as art. 39 TRIPS agreement[1] – may vary from jurisdiction to jurisdiction. An act qualifying as infringing in Germany accordingly may be lawful in the U.S. (and vice versa).

### B.     Principle of Territoriality as a Starting Point (Art. 39 TRIPS Agreement)

23.     Art. 39 TRIPS is binding on all contracting states of the WTO (including Germany and the U.S.) and therefore represents a milestone towards international harmonization on the protection of trade secrets, providing certain minimum standards of trade secret

---

[1] The Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) is an international agreement administered by the World Trade Organization that sets down minimum standards for many forms of intellectual property regulation as applied to nationals of other WTO Members.

protection.  It outlines the concept of trade secret by defining 'confidential information' and obliges all contracting states to afford at least the protection provided by art. 10bis of the Paris Convention.  However, it only sets a standard regarding the result, whereas it does not specify the regulatory technique used to achieve such protection. Paying attention to and recognizing the different national traditions, it thereby leaves considerable leeway for the contracting states to shape the protection afforded to trade secrets (Correa, A Commentary on the TRIPS Agreement (2007), p. 370).  Thus, while art. 39 TRIPS attempts to adopt a standard concept of trade secrets, it allows for significant variation in the scope and type of protection provided by the contracting states.

24.    As stated by other legal commentators, from a comparative perspective there are three entirely different types of protection: namely the property approach (e.g. U.S.), the tort law approach, covering competition law (e.g. Germany) and breach of confidence (e.g. UK), and the reliance on criminal law (e.g. France); (Peter/Wiebe in: Busche/Stoll/Wiebe, TRIPS (2013)[2], art. 39 n. 4; Gervais, The TRIPS Agreement (2012)4, 2.487; also compare the Study on Trade Secrets and Confidential Business Information in the Internal Market, April 2013 MARKT/2011/128/D, p. 18 et seq.).  Accordingly, all cases concerning the protection of trade secrets that manifest a cross-border-element have to take heed of the different concepts of protection and respect the policy decisions of the respective legislature.

### C.    Germany's Competition Law-Based Approach to Trade Secret Protection

25.    As many other continental European countries (Correa, p. 367), Germany fulfills its TRIPS-obligation to provide protection of confidential information by a combination of provisions contained in the German Act against Unfair Competition (hereinafter UWG) and the rules of general private law, as set out in the German Civil Code (hereinafter BGB).

26.    §§ 17-20 UWG et seq. regulate the requirements under which a person is liable under criminal law and set out either a fine or imprisonment as sanction in case of violation. In addition, these rules contained in the UWG are acknowledged as so called 'protective laws' by the Civil Code.  Thus, if all elements of the criminal offence governed by the UWG are established this will at the same time qualify as a tort and give rise to liability under the connective rule in general tort law, § 823 section 2 BGB.  In this case, civil liability will include an injunction from further use and damages.

### § 823 Civil Code: Liability in damages

(1) A person who, intentionally or negligently, unlawfully injures the life, body, health, freedom, property or another right of another person is liable to make compensation to the other party for the damage arising from this.

(2) The same duty is held by a person who commits a breach of a statute that is intended to protect another person. If, according to the contents of the statute, it may also be breached without fault, then liability to compensation only exists in the case of fault.

### D.    Determination of the Law Applicable to Non-Contractual Obligations Arising Out of Unfair Competition under German Conflicts of Law Rules

27.     All private law claims resulting from the rules contained in §§ 17 et seq. UWG, in conjunction with § 823 BGB, are qualified as unfair competition law claims. Whether or not these rules apply to a specific case is determined by conflict of law rules of the relevant forum. As the national law has recently been replaced by harmonized European Union law, in the present case we have to distinguish between acts that occurred before and after January 2009.

28.     The scope of application of the German UWG was originally determined by the Introductory Code to the German Civil Code (hereinafter EGBGB). In 2007 the European Community harmonized its conflict of law rules for extra-contractual obligations by the European Regulation no. 864/2007 on the law applicable to non-contractual obligations (hereinafter Rome-II), which took effect on January 11th, 2009. Acts committed before entry into force of Rome-II will continue to be governed by the rules of the EGBGB, whereas orders for forbearance of further use (cease and desist orders) as well as liability for subsequent acts (damages) will be governed by the new rules (cf. Austrian High Court of Justice on the temporary scope of application of Rome-II, OGH September 20th 2011, GRUR Int 2012, 468 – Rohrprodukte). If the acts giving rise to a claim took place before the relevant date, but the injunction granted covers a time-span after Rome-II entered into force, the adjudicating court has to distinguish between the two phases and determine the applicable law for each of them. This rule applies in the present dispute because Hereaus bases its claims against Esschem on acts that allegedly took place between 2004 and 2006, when the EGBGB was still applicable, but seeks an injunction for the future, which places the injunction within the scope of the new Rome-II regime.

29.     This distinction between the two phases is not only necessary from a formal point of view, but leads to the application of different conflict of law rules, which may be relevant in the case at hand for two reasons. First the EGBGB, as the general rule on tort law, refers to the place where the act was committed, whereas Rome-II is based on the general rule that the place where the protected interest has been compromised is relevant. Second, after Rome-II's entry into force, the German legislature is not allowed to (artificially) extend the scope of application beyond the German territory. Accordingly, the reference in § 17 para. 5 UWG to § 5 of the Criminal Code does not apply to civil remedies (Sack, Internationales Lauterkeitsrecht nach der Rom-II-VO, WRP 2008, 845, 850).

**E.      The Law Applicable to the Alleged Acts of Esschem**

30.     Under German law, the conflict of law analysis must be based on the facts presented in the statement of claim, whether these facts are correct or rightfully contested is left to the appraisal of the merits of the case. The starting point therefore is Heraeus' complaint. In its Pennsylvania complaint, Heraeus alleges that Esschem gained illicit access to information, which it knew – or should have known – to be a trade secret of Heraeus. Further the complaint notes that 'a substantial part of the events giving rise to the claims occurred within' the U.S. (see Complaint, ¶ 6.). No acts of Esschem abroad are mentioned in the complaint and the complaint specifically asserts a trade secret claim against Esschem under the PUTSA.

31.     As Heraeus' prayer for relief is based on unfair competition, tort law and on unjust enrichment a German court would apply the conflict of law rules, which were in force at the time the alleged acts were committed. According to the complaint the alleged acts took place

between 2004 and 2006, i.e. before January 11th 2009. Consequently they are governed by art. 38 et seq. EGBGB.

32.    The relevant roles for torts may be found in art. 40 para. 1 and 2 and art 41 EGBGB. They read:

**Art. 40 EGBGB: Tort**

(1) Tort claims are governed by the law of the country in which the liable party has acted. The injured party can demand that instead of this law, the law of the country in which the injury occurred is to be applied. The option can be used only in the first instance court until the conclusion of the pretrial hearing or until the end of the written preliminary procedure.

(2) If, at the time of the occurrence of the event underlying the liability, the liable party and the injured party both had their habitual residence in the same country, the law of that country shall apply. For companies or firms and other bodies incorporate or unincorporate, the principal establishment, or where a branch is involved, this establishment, shall be treated as the place of the habitual residence.

**Art. 41: Substantially closer connection**

(1) If there is a substantially closer connection with the law of a country other than that applicable under articles 38 to 40 para. 2, then the law of that other country shall apply.

33.    According to art. 40 para. 1 sentence 1 EGBGB tort claims – as a general rule – are governed by the law of the country in which the liable party has acted (Sack, Das internationale Wettbewerbs- und Immaterialgüterrecht nach der EGBGB-Novelle, WRP 2000, 269, 273).  Although there are two possible exceptions, none of them applies in the present case: The exception based on a common habitual residence under art. 40 para. 2 EGBGB does not apply, because the parties do not have their principal place of business in the same state. Neither is there an apparent closer connection under art. 42 EGBGB.  Accordingly, the general rule in art. 40 para.1 has to be applied, and the place where the alleged acts have been committed is decisive (BGH July 1st 1960 GRUR 1961, 40, 43 – Wurftaubenpressen: applying German law in favor of a French company, because the disclosure to (and access of) a German competitor has taken place in Munich). By virtue of art. 38 EGBGB the same rule applies for unjust enrichment. The alleged acts of Esschem's before the present court have undisputedly taken place only in the U.S. Consequently, a German court would apply U.S. law under these circumstances, finding that German law is not applicable to the dispute between Heraeus and Esschem. By contrast, the acts which lie at the heart of the dispute now before the German courts are the alleged divulgence of a trade secret by Biomet Germany and some of its employees respectively; i.e. acts which undisputedly must be located in Germany. Accordingly, the German judgment in the dispute between Heraeus and Biomet has applied German unfair competition law. Heraeus' motion to apply the German judgment in the U.S., in essence would result in applying German law to acts that Esschem allegedly has committed in Pennsylvania.

34.    With regard to all damages for acts which have taken place after January 2009, and in particular with regard to a possible prohibition of future use, the applicable law has to be

determined in accordance with the European Regulation (Rome-II). Under Rome-II claims based on an alleged act of unfair competition come under art. 6 Rome-II. This provision distinguishes between acts of unfair competition that impact the market as such, i.e. compromise the interests of competitors, consumers and the general public alike (para. 1), and acts which are directed against a specific competitor and primarily affect his interests (para. 2). According to the predominant opinion the misappropriation of trade secrets comes under para. 2 (European Commission, Explanatory Memorandum, COM (2003)427 final, p. 16; Sack, Art. 6 Abs. 2 Rom II VO und "bilaterales" unlauteres Wettbewerbsverhalten, GRUR Int 2012, 601, 604). Whereas art. 6 para 1 contains a specific rule for acts of unfair competition, art. 6 para. 2 Rome-II on bilateral acts refers back to the general rule for torts set out in art. 4 Rome-II.

35.      Under art. 4 Rome-II the place where the damage occurred is relevant. It is well established that the 'damage' is not the financial loss, but the direct injury to (or compromise of) the interest protected (European Commission, Explanatory Memorandum, COM (2003)427 final, p. 11: 'In the event of a traffic accident, for example, the place of the direct damage is the place where the collision occurs, irrespective of financial or non-material damage sustained in another country'). The act that Heraeus is complaining about – gaining illicit access – can only have taken place at the seat of Esschem in the U.S. Accordingly, under the new Rome-II-regime a German court similarly would apply U.S. law to the appraisal of Esschem's alleged acts.

36.      This proposition is confirmed by a recent judgment of the Austrian High Court of Justice interpreting art. 6 para. 2 Rome-II (OGH September 20th 2011, GRUR Int 2012, 468 – Rohrprodukte). In this case, two former employees residing in Austria disclosed a trade secret of an Austrian company to a Brazilian business, which supposedly knew that the trade secret had been obtained unlawfully. The court held that while the act of disclosure by the two Austrian tortfeasors was governed by Austrian law, the alleged improper receipt of such information by the Brazilian business was governed by Brazilian law.

37.      As established case law on the interpretation of art. 6 para. 2 Rome-II – apart from the judgment mentioned – so far remains rare, two further aspects may be of interest:

38.      First, even if a conflict of law analysis would point towards the application of German law as the governing lex causae, the German Act Against Unfair Competition would not be applicable in substance to the case at hand. As mentioned above, the UWG aims at securing fair market conditions in Germany. It is therefore well established that this inherent limitation has to be observed when applying the UWG to cross-border cases. Consequently, an act committed abroad cannot be prohibited, solely because it would be unlawful if it had been committed in Germany (BGH May 13th 2004, GRUR Int 2005, 338 – Rotpreisrevolution: In this case a Luxembourg company had advertised clearance sales in a German local newspaper, which had they taken place in Germany would have been contrary to the discount statute then still in force, but were permissible under Luxembourg competition law).

39.      Second, any act punishable under unfair competition law requires a finding that such act is 'unfair' in the meaning of § 3 UWG or 'disloyal' (or 'unlawful' respectively) in the meaning of §§ 17 et seq. UWG. The terms 'unfair', 'disloyal' and 'unlawful' are an implementation of art. 10bis Paris Convention (and art. 39 TRIPS respectively) and in their essence refer to acts contrary to 'honest commercial practice'. What is honest commercial

practice, however, depends on the values of a particular society and therefore will vary between contracting states (Correa, p. 371 et seq.). For example, the Federal Court of Justice has rejected the application of a particularly strict German rule on unfair competition to bribe payments, because it deviated from the then customary practice in the relevant Italian market (BGH March 27th 1968, GRUR 1968, 577, 589 – Bierexport). In appraising whether an act is 'disloyal,' the customs of the place where the act was committed must be explored and acknowledged (BGH July 24th, 1957, GRUR 1958, 189 ff. – Zeiß; BGH December 12th 1959, GRUR 1960, 372 , 377 – Kodak, BGH December 20th 1963, GRUR 1964, 316, 319 – Stahlexport). Therefore, with respect to Heraeus' claims against Esschem, the merits of the case would turn on whether Esschem has committed any acts that are contrary to honest practice as required by the U.S. market in which it acted.

40.     This analysis is in line with the general aim of German competition law, namely to provide for a level playing field in the German market (Sack, WRP 2000, 269, 279 et seq.; Sack, GRUR Int 2012, 601, 605 with further references) and the corresponding expectancy that a foreign court would respect this policy decision with regard to acts which occurred in Germany. That goal would be thwarted if the duties of the market actors turned on an appraisal of whether their acts were legitimate under some other foreign competition law, because a potentially harmed market actor has his registered seat abroad. Such an approach would create great uncertainty as the lawful commercial practice would depend on the nationality of the potential aggrieved party. That applying the law of the seat of the aggrieved party is far from workable is particularly apparent in trade secret cases. In fact, this approach would significantly curtail competition as a market actor may not (and cannot) know whether an act considered lawful at the place of performance may compromise any foreign trade secrets and if so whose interests may be concerned by such acts.

## V.     THE GERMAN JUDGMENT WAS RENDERED UNDER DIFFERENT LEGAL STANDARDS THAN THOSE APPLICABLE TO THE PENNSYLVANIA ACTION

### A.     Lack of Identical Issues

41.     The issues and the acts forming the factual basis for the German judgment were – in line with art. 38 et seq. EGBGB and art. 6 Rome-II – adjudicated under German law, because the main activities by the Biomet group allegedly took place in Germany. By contrast, the conflict of law analysis with regard to Heraeus' trade secret misappropriation claim against Esschem points towards the application of U.S. law as the law of the market in which Esschem participates in competition. Therefore, the rules contained in §§ 17 et seq. UWG, which are the basis for the German judgment, are not applicable to Esschem's alleged activities at issue in the Eastern District Court of Pennsylvania. As the activities of Biomet and Esschem allegedly were committed in different countries and have to be measured against the standards of different national laws, the two cases cannot qualify as the same cause of action with identical issues.

### B.     EU and German Trade Secret Protection

#### 1.     Trade Secrets in the EU

42.     As mentioned above the scope of protection of trade secrets forms a crucial part

of any market system. Yet, different systems in different markets hamper cross-border activities. This in particular holds true for the EU internal market, which by and large is governed by the market freedoms, but can be curtailed by diverging national rules on specific issues. Therefore the broad variations between the national regimes protecting trade secrets has been a long-standing concern of the European Commission and finally is up for reform.

43.     As pointed out in the Study on Trade Secrets and Confidential Business Information in the Internal Market (April 2013 MARKT/2011/128/D), which was commissioned by the European Commission, the differences between the current national protection schemes do not only pertain to the regulatory technique or to details, but in fact bear on the balance between innovation and imitation, both indispensable facts contributing to the functioning of the internal market. Severe differences between the national laws of EU Member States include *inter alia* the concept of what constitutes a trade secret, and the limits on trade secret protection in the interest of employee's mobility and the freedom of competition – including reverse engineering – and the remedies available.

44.     Against this background, the European Union has recently decided to harmonize trade secret law. The new EU framework for protection of trade secrets is contained in the 'Proposal for a Directive of the European Parliament and of the Council on the protection of undisclosed know-how and business information (trade secrets) against their unlawful acquisition, use and disclosure'. The current text is the result of negotiations between the European Parliament and the Council of December 15th, 2015 (Brussels 18th December 2015 Codec 1747; available at: http://data.consilium.europa.eu/doc/document/ST-15382-2015-REV-1/en/pdf) and is expected to be enacted in March 2016. Within two years from entry into force the German legislature will then have to transpose the Directive into national law.

45.     The new EU regulatory framework by and large follows a property approach. It sets out subject matter (art. 1), defines the concept of trade secret, trade secret holder and infringing acts (art. 2), sets out limitations by lawful acquisition such as independent discovery and reverse engineering (art. 2a). The core rule on unlawful acquisition, use and disclosure mirrors the rights of the trade secret holder to prohibit unauthorized access and dishonest conduct (art. 3), which may be limited by exceptions that secure freedom of expression, whistle-blowing and similar legitimate interests (art. 4). This protection is then safeguarded by remedies and procedural guarantees tailored after the rules applicable to intellectual property rights (art. 5-14).

46.     It is acknowledged that the implementation of the Directive into German law will lead to major alterations of the present law, which in particular concerns the definition of the scope of protection and the limitations in favor of free competition.

47.     The subsequent analysis is based on the current law, as it was applied by the German courts to the action pending between Heraeus and Biomet, but will highlight necessary changes under the new European framework.

## 2.     Trade Secrets under German Law

48.     There is no German trade secret law per se. Instead, there is a patchwork of laws protecting against the misappropriations of trade secrets that are embedded into German unfair

competition law. The UWG is based on the concept of private law enforcement of fair market conditions. Its main aim is to prevent that a competitor secures a competitive edge by unfair measures (cf. BGH December 17th 1981, GRUR 1982, 225, 226 – Straßendecke II).

49.     Although the UWG by and large (chapter 1-3) is private (or civil) law, the most important rules on trade secret protection for historical reasons are set out as criminal law rules (chapter 4). In fact, the first rule enacted covering the misappropriation of trade secrets concerned the disclosure or use by employees and was first made punishable by law under the Act Against Unfair Competition of 1896. It was framed as a criminal law rule, because the legislature then assumed that infringement typically is committed by employees, who do not have the funds to compensate damages under private law. Accordingly, the legislature originally put the emphasis on criminal law rules intended to deter the potential tort-feasor. A later amendment then introduced a sanction for industrial espionage by a third party. Both rules were then adopted by the UWG of 1909 and have since then remained without significant changes, in particular the regulatory technique has been upheld.

50.     The fact that German trade secret protection is rooted in liability for unfair competition has a far-reaching consequence. In line with the general approach that the UWG prohibits specific acts considered as unfair, similarly trade secrets are not protected as a good (or property right) allocated to a right-holder, but are protected solely against specific acts considered as inappropriate or disloyal. Accordingly, trade secrets are not considered property rights, but rather as a mere fact and are protected against specific types of attacks (Ohly/Sosnitza, UWG (2014), Vor § 17 n. 3; Ahrens/McGuire, Model Law on Intellectual Property (2012), Book 1 § 10). The primary focus of the statutory rules therefore is to protect the market against these improper acts, as they are conceived as undermining fair competition and the level playing field in the market. The emphasis is on deterrence of disloyal behavior.

51.     This doctrinal approach has substantial impact on the scope of protection. First, because this regulatory technique relies on criminal law, the distinct unlawful acts must be interpreted narrowly, as otherwise the German constitutional principle of nulla poena sine lege would be violated. For the sake of legal certainty, they may only be applied if every single requirement set out in the respective provision the claimant relies on is proven to the satisfaction of the court. As discussed below, the requirements are very specific and limited in scope, and there is no general offence of abuse of a trade secret. The rules are criticized as arbitrary, because on the one hand the outdated rules leave plenty of room for the legal use of (or access to) another's trade secrets. Whoever gains access by proper means is free to use and even disclose the information to the public (BGH May 3rd 2001, GRUR 2002, 91, 92 – Spritzgießwerkzeuge; Ohly/Sosnitza, UWG (2014), Vor § 17 n. 3). On the other hand, if a specific act fulfills all the requirements of § 17 or § 18 UWG it will be punished, whether or not the defendant (or the public) had a legitimate interest. 'In any case a red line that runs through German trade secrets law is the distinction between normally and properly acquired secrets, and those acquired with improper deliberations and the assistance of technical means.' (van Caenegem, Trade Secrets and Intellectual Property (2014), p. 170).

52.     In fact, the majority of published court decisions deal with the question of whether a former employee may freely exploit knowledge previously gained or whether this should be prohibited in the interest of a former employer, seeking to preserve its competitive

advantage (BGH November 6th GRUR 1964, 215 – Milchfahrer; BGH November 11th GRUR 1983, 179 – Stapelautomat; BGH May 3rd 2001 GRUR 2002, 91, 92 – Spritzgießwerkzeuge; BGH GRUR 2003, 356 – Präzisionsmessgeräte; BGH November 7th GRUR 2006, 1044 – Kundendatenprogramm; BGH February 26th 2009, GRUR 2009, 603 – Versicherungsvertreter; also cf. Köhler, in Bornkamm/Köhler, UWG 34th ed., 2016, § 17 note 59). The German policy decision is to give preference to the employee and his professional advancement, who should be able to use the knowledge honestly gained even after he has left the company as freely as possible – even against his former employer — unless he is bound by a non-compete-agreement (BGH May 3rd 2001, GRUR 2002, 91, 92 – Spritzgießwerkzeuge; OLG Frankfurt, April 21st 1988, CR 1990, 589 – Dichtungsmasse).

53.     But the same formalistic approach may also have the opposite effect. Reverse engineering may serve as an example. Academic scholars (Lemley, The surprising virtues of treating trade secrets as IP rights, in Dreyfuss/Stranburg (2011), 109; Ohly, Reverse Engineering: Unfair Competition or Catalyst for Innovation?, liber amoricum Strauss (2009), 535 et seq.) and the European competition policy (Study on Trade Secrets and Confidential Business Information in the Internal Market, April 2013 MARKT/2011/128/D, p. 85 et seq.) unanimously state that reverse engineering is in the interest of spreading innovation and fostering competition and accordingly should be considered lawful (cf. Recital 10 Draft Directive: 'In the interest of innovation and to foster competition, the provisions of this Directive should not create any exclusive right on the know-how or information protected as trade secrets. Thus, independent discovery of the same know-how or information remains possible. Reverse engineering of a lawfully acquired product is a lawful means of acquiring information except when otherwise agreed by contract. The freedom of entering into such contractual arrangements may however be limited by law.') Yet, the current German statutes are devoid of any such limitation in the interest of freedom of competition. According to a long-standing line of precedents reverse engineering is held to qualify as an unlawful technical means of acquiring knowledge under § 17 et seq. UWG and thus sanctioned. This rule will have to be amended as soon as the draft EU-Directive comes into force, as the EU Directive explicitly allows reverse engineering of any product legally acquired in the market (cf. Art. 2a para. 1a Draft Directive) .

### 3.     The Most Significant Sources of Trade Secret Protection in German Law are Found in the Criminal Provisions of the Act Against Unfair Competition

54.     The core provisions in German trade secret law are found in §§ 17-19 UWG. In addition the general rule on prohibition of unfair competition in § 3 in conjunction with § 4 no. 3 UWG may apply. German law has some other special trade secret provisions – contained mainly in the Criminal Code – covering the proliferation and use of trade secrets through certain professionals, such as attorneys, doctors, public notaries, public servants etc., but these are of no relevance to this case. As the German judgment in the lawsuit between Heraeus and Biomet is solely based on §§ 17 et seq. (cf. OLG Frankfurt June 5th 2014, Judgment, p. 26), the subsequent analysis will focus on the requirements under which a person is liable under criminal law and – by virtue of § 823 para. 2 – liable under private law.

55.     § 17 UWG focuses on two forms of penalized conduct: unauthorized disclosure by a current employee (betrayal of secrets, para. 1) and certain forms of industrial espionage

13

engaged in by any person (industrial espionage and handling of unlawfully acquired secrets, para. 2). Both forms frequently interact, as an employee who may have gained access to information by means going beyond his normal course of work may divulge this information to a person, who engages in industrial espionage, i.e. gains, secures, discloses or exploits the information. Yet, the acts of the person divulging the information and the act of the person receiving have to be appraised independently, as they are distinct requirements that impose liability on different defendants.

56.     Yet, both rules have in common, that it is not the intention – such as to damage a competitor – or the result – the access to the information – which is penalized, but only the precisely circumscribed means of gaining access or securing the information. The penalized act may either be the unauthorized communication of another's trade secrets to third parties, the unauthorized procurement or storing of secrets, or the unauthorized use of a third party's trade secret.

57.     A further legal basis for trade secret protection is contained in § 18 UWG. The so-called offence of 'piracy of samples' (Vorlagenfreibeuterei) penalizes the transmission or use of objects that have been entrusted to somebody, e.g. to business partners.  It imposes a sanction for the misuse of prototypes, models, plans and the like, if the entrusted person's acts are committed for personal gain, gain of a third party or with the intention of causing harm to the business owner.

58.     § 19 UWG broadens the offences of § 17 and § 18 to also cover preparatory actions beyond the attempted misappropriation phase.

59.     All criminal offences under §§ 17-19 UWG require intent. This does not necessarily refer to positive knowledge, as conditional intent is sufficient. Conditional intent is established if the offender is aware that the information may derive from an unlawful act, which will include grossly negligent acts or willingly closing his eyes, which I understand is similar to the U.S. law concept of "willful blindness." But, under German law, there is no duty to inquire about the source of the information.

60.     As mentioned above, trade secret misappropriation meeting the requirements of § 17 or 18 UWG is considered infringement of a protective law (so called 'Schutzgesetz') and thus, by virtue of § 823 para 2 BGB, will also give rise to private law remedies. These typically include the duty to provide information on use made, damages for past impairment and enjoinment of further use of the trade secret. Under § 823 para. 2 Civil Code it is the duty of the claimant to convince the court first that the defendant has committed a specific act, which meets the requirements of one of the statutory offenses mentioned, and second, that there  is impending or actual  damage. Only if these criteria are met, i.e. apparent use, communication or disclosure by a qualified tortfeasor, the question will arise whether the information accessed or disclosed actually qualifies as a trade secret.

    **4.**    **German Law Recognizes Two Categories of Trade Secrets: Industrial Secrets (Betriebsgeheimnis) and Commercial Secrets (Geschäftsgeheimnis)**

61.     Despite their significance in civil law suits as a basis for injunctive relief and compensation claims, the rules contained in §§ 17 et seq. UWG do not provide any definition of the core concept of 'business or trade secret'. The term 'know-how' is not a German statutory term at all, but used only in EU-instruments (such as the group block exemption regulation on technology transfer and the upcoming directive on trade secrets) and of course frequently in legal practice in a contractual context. The gap of a concise definition of trade secrets has been filled by jurisprudence and academic scholars alike.

62.     Under German legal theory and terminology, business secrets relate to the commercial section of a business, trade secrets to the technical side of a business. This distinction merely serves the purpose of describing possible subject matter, which for example may cover marketing policies, supplier lists, construction drafts and manufacturing processes. The combined term 'business and trade secret' is comprehensively used as both are protected in exactly the same way. One apparent difference perhaps is that 'Betriebsgeheimnisse' are technical and therefore may overlap with patented inventions, whereas under German law 'Geschäftsgeheimnisse' are not eligible for any IP protection.

63.     The now well settled definition by and large corresponds to art. 39 TRIPS agreement and according to the predominant opinion and case law (BGH March 15th  1955, GRUR 1955, 424, 425 – Möbelpaste; confirmed by BGH July 1st 1960 GRUR 1961, 40, 43 – Wurftaubenpressen; Ohly/Sosnitza, UWG (2014), § 17 n. 5) must satisfy four requirements. Information may qualify as trade secret if it: (a) is not in the public domain, (b) is connected to a business, and (c) is kept secret by the person entitled by reasonable measures (d) for the purpose of economic interest.

### 5.     The Four Requirements for Trade Secret Protection Under German Law

#### a.     Not in the Public Domain

64.     The first pre-requisite for the existence of a trade secret is that the information is not in the public domain. Whereas other jurisdictions by this requirement already rule out any information which is generally known, i.e. is state of the art, the test under German law only refers to the number of persons who have access. To qualify as a secret this number must be limited (BGH July 10th1963, GRUR, 1964, 31, 32 – Petromax II). The person exercising legitimate control must maintain control over this group of people and exclude his competitors from knowledge (Kraßer, Grundlagen des zivilrechtlichen Schutzes von Geschäfts- und Betriebsgeheimnissen sowie von Know-how, GRUR 1977, 177, 179; Többens, Die Straftaten nach dem Gesetz gegen den unlauteren Wettbewerb, WRP 2005, 552, 556).

65.     The notion of a restricted group of people is dependent on the specific circumstances of the individual case. Information in general is held to be secret if it is shared only with a specified group of persons, provided that the members of this group are under a duty to keep it confidential. Such duty may either arise from the employer-employee relationship, or other contractual or statutory duties (BGH May 3rd 2001, GRUR 2002, 91, 93 – Spritzgießwerkzeuge; Ohly/Sosnitza, UWG (2014), § 17 n. 8).

66. Thus, the mere fact that the information as such is in the public domain will not per se rule out the existence of a trade secret. If for example a business uses a specific process of manufacture, which as such is well known, but the competitors do not know that this particular business uses this particular process, then this relation between the business and the process may qualify as a trade secret (BGH GRUR 1961, 40, 43 – Wurftaubenpresse; BGH GRUR 2003, 356, 358 – Präzisionsmessgeräte; also cf. Köhler, in Bornkamm/Köhler, UWG 34th ed., 2016, § 17 note 5). The choice between different possible production methods or suppliers is considered as a competitive advantage that should be protected.

67. Different from patent law lack of novelty is not accepted as a valid defense against trade secret misappropriation.

68. I have reviewed the expert report of Esschem's technical expert, Dr. Stuart Cooper. Dr. Cooper's opinion provides substantial evidence that Esschem is not practicing Heraeus' alleged trade secrets, and that certain Heraeus' alleged trade secrets were publically known before 2004. This is significant for two reasons: first, Esschem was not a party to the German proceeding between Heraeus and the Biomet Group and, thus, could not offer such evidence before the German courts; second, even if such evidence was presented in the German proceeding, Heraeus may still have prevailed because of significance differences between U.S. and German trade secret law both regarding what constitutes a trade secret and reverse engineering.

69. Under German law, information is only held to be in the public domain if it is generally known in the relevant professional circles or easily accessible. Easily accessible means that it can be readily obtained in a normal or routine manner. Accordingly, neither the fact that a product encompassing the secret is distributed in the market nor the fact that others could have arrived at the same information independently will destroy secrecy. This notion is underlined by the assessment of the Higher Regional Court of Frankfurt (cf. OLG Frankfurt June 5th 2014, Judgment, p. 38) that the specific source of chlorophyll, i.e. the vendor MicroPlus as a possible supplier, as such constitutes a trade secret despite the fact, that the ingredient E 141 was indicated on the marketed package. The Frankfurt Court reasoned that it would be beyond common experience that Biomet would have chosen this product from the same vendor had they no known, that this was the source of Chlorophyll that was used by Hereaus. The fact that supplier and product as such were publicly available was irrelevant.

70. Secrecy naturally ceases if the relevant information is disclosed to the public (Brammsen, Münchner Kommentar UWG (2014), § 17 UWG n. 18). This may occur by voluntary publication or by a third party, even in breach of a contractual duty. Further a secret may become generally known if it can easily be read from a product, which has entered the market. The fact that the content or the production process can be determined by lawful reverse engineering therefore in theory should impact on the qualification as a secret (Kiethe/Groeschke, Die Durchsetzung von Schadensersatzansprüchen in Fällen der Betriebs- und Wirtschaftsspionage WRP 2005, 1358, 1364).

71. However, it must be emphasized that German law takes a very restrictive approach on reverse engineering. The contents or the production process of a product will only be held to be generally known if they can be reconstructed by using generally available material

and without any substantial effort either of time or cost (BGH, January 7th 1958, GRUR 1958, 297 – Petromax I) or difficult and non-obvious considerations (BGH February 12th 1980, GRUR 1980, 750 – Pankreaplex II: re-working a medication on the basis of the configuration indicated on the packaging). Accordingly the assessment of reverse engineering turns on the question of what may be held to be 'substantial costs or effort'. Unfortunately, there are very few cases, but these clearly depict the extraordinary restrictive approach. For instance the use of more than 70 hours and 5000 German Marks (today approximately 2500 €) have been held to be substantial (BayObLG August 28th 1990, GRUR 1991, 694, 695 – Geldspielautomat; OLG Hamburg October 19th 2000, GRUR-RR 2001, 137, 139 – PM-Regler confirmed the doctrine, but in the case at hand dismissed the claim based on illegitimate reverse engineering, because the claimant had beforehand published engineering drawings). A current decision held that 4 hours are not a substantial effort, but indicated that the 70h rule is still valid (OLG Celle February 2nd 2015; annotation by Kalbfuss, WRP 2015, 1015).

72.    Further it is common opinion under German law that the sale of a product that incorporates the information will not compromise its secrecy as long as it is not disclosed in the course of the customary and intended use by the buyer (Brammsen, Münchner Kommentar UWG (2014), § 17 UWG n. 17). This apparently is a reference to the leading Reichsgericht case which put the emphasis on the fact, that the product in the market was not 'meant to be taken apart' (RG November 22nd 1935, RGZ 149, 329, 332 – Stiefeleisenpresse). Accordingly, the composition of a marketed product, such as a medical device, is not in the public domain, as the customer is expected to use or apply it, not to analyze it.

73.    This very restrictive approach is further underlined by the statements and proposals of the German stakeholders in the current debate on the upcoming EU-Directive on the protection of trade secrets. As mentioned above the Draft Directive in art. 2a contains a clause, which explicitly allows reverse engineering, which has spiked decided and long-standing opposition from the German side (cf. GRUR Stellungnahme March 19th 2014, p. 8; GRUR Fachausschuss, GRUR 2014, 453, 455 et seq.; Knaak/Kur/Hilty, Comments of the Max Planck Institute, IIC 2014, 953, 961).

### b.    Connected with a Particular Business

74.    A further pre-requisite of a trade secret in the meaning of §§ 17 et seq. UWG is that the information is related to the operation of a specific business. Consequently, all information that impacts only upon the private sphere of the owner or an employee or concerns the customers is excluded (OLG Stuttgart October 10th 1981, GRUR 1982, 315, 316 – Gerätewartung). But the company connection is maintained when products containing the secret are sold or handed over (Reichsgericht, November 22nd 1935, RGZ 149, 329, 332 – Stiefeleisenpresse) or when company waste is removed (OLG Hamm, WRP 1993, 118).

### c.    The Owner Must Have the Intention to Keep the Information Secret

75.    The business entitled must have the intention to keep the knowledge secret and has to communicate this intention by some means (BGH November 26th 1968, GRUR 1969, 341, 343 – Räumzange), an effort that regularly is complied with by either technical measures or non-disclose and non-compete clauses. The required interest is only held to be lacking when the

holder of the secret demonstrates that he does not place much importance on information being treated in a trustworthy manner, for example by passing on the information to a third party who is not subject to a non-disclosure agreement (BGH December 17th 1981, GRUR 1982, 225, 226 – Straßendecke II).

76.     As the main purpose of this criterion is to distinguish a trade secret from information that simply remains unknown by chance (BGH July 10th  1963, GRUR 1964, 31 – Petromax II)  the standard is very low. The intention as a general rule is presumed with regard to all internal company information: it is held to suffice, that this desire is 'imminent in the nature of the information'. As long as a business usually has an interest in protecting such information, the required intention will be presumed (BGH July 10th 1963, GRUR 1964, 31 – Petromax II; BGH February 18th 1977,GRUR 1977, 539, 540 – Prozessrechner; Ohly/Sosnitza, UWG (2014), § 17 n. 11). Therefore, even information that has not (yet) been revealed to the person exercising legitimate control may qualify as a trade secret (BGH February 18th 1977, GRUR 1977, 539, 540 – Prozessrechner).

77.     In practice, German courts apply a generous standard to what constitutes a trade secret, which is problematic because it makes it unnecessary for a company to maintain a clear internal trade secret policy or any inventory of the information considered to be company trade secrets. This is revealed by the difficulties Hereaus faced in the German proceedings when the Frankfurt court requested to define what exactly the trade secrets were, they intended to rely on.

78.     Keeping the different standards of PUTSA in mind it also has to be emphasized that at present German law does not require the trade secret holder to take reasonable steps to ensure secrecy. However, this may change soon as Article 2 of the new EU Trade Secret Directive provides that the protected information must be 'subject to reasonable steps under the circumstances, by the person lawfully in control of the information'.

### d.     The Business Has an Economic Interest in Keeping the Information Secret

79.     The last requirement established is that the claimant must have an objective and legitimate economic reason in preserving the secrecy of the information (Kiethe/Groeschke, Die Durchsetzung von Schadensersatzansprüchen in Fällen der Betriebs- und Wirtschaftsspionage, WRP 2005, 1358, 1364). This requirement is met if disclosure of the information could have a negative impact on the competitiveness of the company (Ohly/Sosnitza, § 17 n. 12). Leaving aside the controversial issue of whistle-blowing and alike (cf. Ohly/Sosnitza, § 17 n. 12) the main purpose of this objective criterion is to prevent a business from randomly deciding which information can qualify as a trade secret (BGH March 15th 1955, GRUR 1955, 424, 426 – Möbelpaste). However, the threshold is very low and in its essence only rules out obvious abuse.

80.     Keeping the different structure of U.S. law in mind, it may be useful to add that any competitive value in maintaining secrecy will suffice. Whether the business itself has invested any effort in the development of the relevant information or the confidentiality of it is without relevance, as German trade secret law does not make the protection dependent on any specific quality of, or investment in, the subject matter (Brammsen, Münchner Kommentar UWG (2014), § 17 UWG n. 15). This is the main difference between a trade secret and an

intellectual property right and one rationale as to why trade secret protection is broad with regard to subject matter, but weak with regard to the scope of protection (cf. McGuire, Know-how: Stiefkind, Störenfried oder Sorgenkind? GRUR 2015, 424, 426).

## VI.    CLAIMS BASED ON DIFFERENT ACTS BY DIFFERENT PARTIES CANNOT QUALIFY AS THE SAME CAUSE OF ACTION

81.    German law protects the confidentiality of information, but not the confidential information as such. It mainly relies on criminal sanctions, if the requirements of a criminal offence are satisfied. The general clause on tort liability may at the same time give rise to civil remedies.

82.    As the statutory rules are very limited in scope and very specific in their requirements, a claim for trade secret misappropriation under German law has to specify the purported tort-feasor and the respective act complained about, in particular whether it is disloyal disclosure, use or illicit access. Thus, the Frankfurt court statement that Biomet Germany has disclosed a trade secret to Esschem in breach of confidentiality does not imply that Esschem is liable under any German unfair competition law, nor would vice versa the finding that Biomet Germany is not liable as such release Esschem from liability under unfair competition law.

83.    In fact, German law would require the acts of Biomet and Esschem to be appraised separately. The necessity to distinguish between unlawful divulgence, on the one hand, and illicit access, on the other hand, is underlined by the fact that the relief sought in both proceedings differs. Whereas the German judgment prohibits Biomet Germany to manufacture, offer and distribute specific types of bone cement inter alia using copolymers Esschem R262 and/or R263 (OLG Frankfurt June 5th 2014, Judgment, p. 2 et seq.), the injunctive relief sought against Esschem is solely the prohibition of the production of specific copolymers (Complaint September 8th 2014, ¶ 154). The two cases accordingly neither refer to the same parties, nor to the same acts and therefore, the German judgment against Biomet did not involve the same cause of action nor did it decide the same issues as those involved in the U.S. lawsuit against Esschem.

## VII.   THE GERMAN JUDGMENT IS NOT ENTITLED TO EXTRA-TERRITORIAL EFFECT

### A.    The German Injunction Has No Extra-territorial Effect

84.    I understand that Heraeus seeks to enforce the German judgment against Biomet by giving effect to the judgment beyond its original territorial scope, namely Germany. However, it is a generally acknowledged principle of international civil procedure that recognizing a judgment means to give it the same, and not more, effect as it would have in the country in which the decision was rendered. Accordingly, a judgment cannot have a broader extra-territorial effect than that to which it is entitled in its jurisdiction of origin. Thus, it is necessary to clarify the territorial scope of the Frankfurt judgment.

85.    In this respect it is important to clearly distinguish between the territorial scope of the judgment and the possibility of recognition and enforcement abroad. The question of scope refers to whether the injunction only enjoins the defendant from further acts in the forum or also covers possible future acts abroad, i.e. distribution of infringing goods in other markets outside

of Germany. The question of enforcement refers to whether a claimant, who has obtained a title in his favor, is entitled to apply for coercive measures in another jurisdiction if the defendant commits further acts within the territorial scope of the injunction. If – as will be shown in the case at hand – the territorial scope of the injunction is restricted to Germany and the injunction provides that the defendant has to pay a fine for every further prohibited act in Germany, then enforcement of the judgment – for instance in another EU Member State – allows the claimant to apply for coercive measures, namely collecting such fine, on the basis that the defendant has acted contrary to the judgment in Germany. Recognition and enforcement is, thus, particularly useful if the defendant is not domiciled in the forum. By contrast, a similar act outside the territorial scope of the injunctions will not lead to forfeiture of the fine.

86.     Like most national statutes, the wording of the UWG, on its face, may apply to an act that occurs abroad.  But when it comes to commercial law, the scope of such statutes is not only limited by the rules on conflict of laws, but also by the inherent purpose of the statute itself. As mentioned above, the main purpose of the UWG is to regulate competition in the German market and thus, by its very nature, is restricted to acts that affect the German market This so called self-restricting quality is explicitly acknowledged by case law (BGH May 13th 2004, GRUR Int 2005, 338, 340 – Rotpreisrevolution). As a general rule a judgment based on the rules of the UWG – unless otherwise stated by the court – therefore will only apply to Germany and not be applicable extra territorially (Lindacher, Die internationale Dimension lauterkeitsrechtlicher Unterlassungsansprüche, GRUR Int 2008, 453, 455; Ahrens, Handbuch des Wettbewerbsrecht (2013), Chapter 16 n. 8 et seq.). Thus an injunction only restrains acts which impact on the German market (BGH March 29th 2007, GRUR 2007, 1079 – Bundesdruckerei), such as marketing and sales of goods in Germany. Therefore the scope of the injunction rendered by the Frankfurt court is restricted to Germany, i.e. it enjoins only acts committed in Germany, even if the monetary judgment were enforceable abroad.

87.     German procedural law requires the claimant to specifically request extraterritorial application for its claim in its petition to the court. According to § 308 German Civil Procedure Code (hereinafter ZPO) the adjudicating court is bound by the petition of the claimant. The scope of the court's judgment is limited to exactly what the claimant has asked for in the petition. A German court may neither grant more or a different remedy than that requested in the claimant's petition. This concept is illustrated in the Frankfurt Judgment, which contains a point by point summary that either supports or dismisses the claims set forth in the petition of the claimant, namely Heraeus (OLG Frankfurt June 5th 2014, Judgment, p. 2 et seq.).

88.     A consequence of this strict link between the petition and the judgment imposed by § 308 ZPO is that a court will only rule on foreign elements if it is asked to do so. This will be the case if the claimant either explicitly refers to foreign law or brings short forward and relies on facts that have occurred abroad. If a relevant foreign element is introduced by the claimant, the court will on its own motion scrutinize its jurisdiction and appraise the applicable foreign law. Thus, if the parties present facts that have foreign elements, the court is obliged to ascertain the relevant legal provisions and conduct a conflict of law analysis (which may be very short if not contested) and if necessary set out the relevant foreign statutory provisions under which the judgment is based. By contrast, the scope of a judgment is restricted to the German territory if the parties have not pleaded a foreign element and the court has neither dealt with the conflict of law issues, nor mentioned foreign law as a possible legal foundation for the judgment (Ahrens, Handbuch

des Wettbewerbsrecht (2013), Chapter 16 n. 10; OGH November 27th 2001, GRUR Int 2002, 936, 937 – Universal Stein: on the issue whether a prior German injunction has lis pendens/res judicata effect with regard to Austria; which was rejected).

89.     Heraeus' petition, which led to its German judgment, did not include any claims with a foreign element.  Despite the lengthy judgment, the decision did not include any conflict of law analysis nor provide for any restrictions beyond the German territory, which is not surprising as the Frankfurt judgment explicitly relies on § 18 UWG in conjunction with § 823 para. 2 BGB (cf. OLG Frankfurt June 5th 2014, Judgment, p. 26: 'Der Klägerin bzw. Der Fa. Heraeus Medical GmbH stehen die geltend gemachten Ansprüche in dem aus dem Tenor ersichtlichen Umfang aus §§ 1004, 823 II, 242 BGB i.V.m. § 18 UWG zu.').

90.     The difference between the scope of a judgment and its recognition abroad is illustrated by the application of the European Recognition and Enforcement Regulation (hereinafter Brussels Regulation). Under this regime judgments in civil and commercial matters will be recognized and enforced without any specific further procedure in the entire European Union. Heraeus' German judgment therefore will be formally recognized by all EU-member states under art. 36 et seq. Brussels Regulation insofar as monetary damages were awarded. Yet, its territorial scope regarding the substantive issues, which are covered by the injunction, is limited to the German market (Ahrens, Handbuch des Wettbewerbsrecht (2013), Chapter 16 n. 8). Accordingly, enforcement in another Member State is restricted to damages or penalties for not complying with the judgment in Germany, whereas the injunction will not extend to other European markets (Ohly/Sosnitza, UWG (2014), Einf B n. 20).

91.     This proposition is confirmed by the order rendered by the Commercial Court of Vienna (September 4th 2015, 39 Cg 23/15y – 8), which has denied the application for a provisional injunction against two Austrian affiliates of Biomet. By this application Hereaus sought to extend the injunction issued in the litigation between Hereaus and Biomet Germany by the Higher Regional Court of Frankfurt (Judgment of June 5th 2014) to Austria. The Commercial Court Vienna explicitly states that the motion has to be denied, because the opponent to the motion before the Commercial Court Vienna was not party to the German proceedings and because the Frankfurt Court only dealt with purported infringement in Germany, but not with any acts which allegedly have occurred abroad (page 5 et seq. 'Die im gegenständlichen Fall Beklagten sind nicht Parteien dieses in Deutschland geführten Verfahrens. In seinem Urteil hat sich das OLG Frankfurt am Main lediglich mit behaupteten Verletzungen von Betriebsgeheimnissen der Klägerin in Deutschland, nicht aber mit solchen im Ausland befasst.') The Commercial Court Vienna  further reasons that the Claimant in the German proceedings has neither substantiated any alleged infringement abroad, nor has the Frankfurt Court conducted any appraisal of the international jurisdiction of the German courts or the applicable law. The Commercial Court Vienna in its reasoning further states that the territorial scope of a German judgment as a general rule is restricted to the Federal Republic of Germany. An exception from this rule would have to fulfill two cumulative requirements: first the Claimant must make an application for a broader scope and second the Court has to explicitly state the extraterritorial effect in its operational part. The Commercial Court on this basis has decided that lacking any binding effect by the German court ruling it is left to the Austrian court to assess whether any unlawful acts have been committed by the opponent to the motion before the Austrian court under Austrian unfair competition law.  Accordingly, the court dismissed the motion for a

provisional injunction (cf. page 8).

**B.     Res Judicata Under German Law Is Limited To Only the Court's Ruling on Specific Claims**

92.     Even if the German judgment had extra-territorial effect, any recognition and enforcement would not extend any further than its binding effect in Germany. Under German civil procedure law, the extra-territorial effect of a judgment is defined by the parties to the litigation and limited to the subject matter of the controversy (Stürner/Murray, German Civil Justice (2004), p. 357).

93.     Under German law, res judicata is restricted to the ruling itself, i.e. the operative part of the ruling. According to § 308 Civil Procedure Code (hereinafter ZPO) the award must exactly mirror the parties' petitions. § 322 ZPO adds that judgments will only attain legal validity (res judicata) insofar as the claims asserted have been ruled on. It does not extend to claims that could have been raised or that may have arisen out of the same occurrence.

94.     The operative part of the German judgment sets out that, to the belief of the court, Biomet Germany has misappropriated trade secrets under § 18 para. 1 UWG and its parent companies, Biomet Europe and Biomet U.S. are responsible for these acts under § 31 BGB. Accordingly, Biomet Germany is condemned to comply with the judgment's cease and desist order. All relevant questions the court has reflected on to arrive at this conclusion, such as the existence of a trade secret, the lawful control of Heraeus, the acts qualifying as disloyal etc. are preliminary issues, which the court had to consider and appraise in order to arrive at its judgment. However, under German law the reasoning on which a judgment is based in general does not enter into force of law. German law does not recognize the common law concept of issue preclusion (Murray/Stürner, p. 357), but restricts the binding effect to the operative part of a judgment.

95.     The difference in approach becomes particularly apparent from § 561 ZPO. Under this rule a party cannot base an appeal on the fact, that the reasoning given by the court is wrong, as long as the result is correct. So in case the operative part of the decision is correct, even if based on other grounds, leave to appeal on points of law is to be denied. The Federal Court of Justice accordingly will confirm a judgment as long as the operative part is correct, even if it overturns the reasoning as wrong (cf. Zöller/Heßler, ZPO (2014) § 142 n. 4 who points out that the rule serves procedural efficiency). The rationale of this rule is that the parties have no legitimate interest to have the reasoning corrected, if the result remains the same. This clearly shows that issue determinations are not vested with binding effect.

96.     This restriction to the operative part of the judgment at the same time implies that the binding effect is restricted to exactly those parties, which have been heard in the proceedings. A judgment is res judicata only between the parties to the litigation. § 325 para. 1 ZPO explicitly states: 'A judgment that has entered into force shall take effect for and against the parties to the dispute and the persons who have become successors in title of the parties after the matter has become pending, or who have obtained possession of the disputed object such that one of the parties or its successor in title has become constructive possessor.' As obviously none of the narrow exceptions contained in para. 2 (bona fide acquisition during lis pendens), para. 3 (realty

22

charge mortgage and similar encumbrance of land) and para. 3 (registered maritime mortgage) apply, the binding effect of the Frankfurt judgment is restricted to the parties, namely Heraeus and Biomet.

97.     A further argument militating against giving the German judgment effect abroad is the fact that – leaving aside special rules for intra-EU-matters – recognition and enforcement by definition means to extend the force of res judicata to another jurisdiction. This of course would require that the judgment is res judicata in the original forum. However, according to § 705 ZPO 'Judgments shall not attain legal validity prior to expiry of the period determined for the lodgment of the admissible legal remedy or of the admissible protest. The legal validity shall be suspended in all cases in which the legal remedy or the protest is lodged in due time.' Res judicata effect under German law thus further requires that no ordinary appeal is allowed or pending. As both parties have filed a further appeal to the German Federal Court of Justice, the judgment cannot yet have any res judicata effect.

98.     Of course, even if the further appeal was dismissed and the Frankfurt judgment becomes res judicata, the binding effect will be restricted to the parties to the dispute, i.e., Heraeus and Biomet and the operative part of the judgment deciding Hereaus' claims against Biomet under German law.

## VIII.   RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN GERMANY

### A.     Standard for Recognition and Enforcement of U.S. Judgments in Germany

99.     As recognition and enforcement of court judgments between the U.S. and Germany are based on the principles of reciprocity and comity, it is of particular relevance to determine whether a German court would recognize any binding effect of a U.S. judgment if the tables were turned.

100.    In the absence of any overriding rules of international conventions (such as the Hague Conventions) or EU law (such as the Brussels Regulation on Recognition and Enforcement in Civil and Commercial matters) applicable in the present case, the recognition and enforcement of a foreign judgment in Germany is governed by § 328 ZPO. The most important requirements are that the foreign court has jurisdiction, reciprocity is guaranteed and the result of the judgment does not run contrary to German public policy. In this respect, two issues are of particular interest: first, the fact that German law, at present, does not provide for satisfactory means of obtaining information to assert or defend against trade secret misappropriation claims in order to protect trade secrets in civil proceedings; second, that there is a considerable difference with regard to the admissibility of a reverse engineering defense.

### B.     Procedural Differences Between Germany and the U.S.

101.    First, in German civil cases, pre-trial discovery is not readily available, making proof difficult to obtain for both plaintiffs and defendants. The Federal Court of Justice has established the general rule that the parties are not obliged to facilitate their opponent to win the day (BGH January 8th 1985, GRUR 1985, 512 – Druckbalken; BGH June 11th 1990, NJW 1990, 3151 – Grenzen der prozessualen Aufklärungspflicht). A duty to provide evidence to the

opponent's benefit is not the rule, but the exception and can be based on either procedural or substantive rules. The significant discrepancy in discovery permitted in Germany versus that in the U.S. was highlighted by the fact that in Heraeus' German action against Biomet, Heraeus unilaterally obtained discovery for use in the German action through multiple 28 U.S.C. §1782 proceedings that Heraeus filed against Biomet and Esschem in the U.S. Biomet had no corresponding way to obtain evidence for its defense from Heraeus under German law.

102.    Under certain narrow circumstances, procedural duties to disclose information may apply under § 142 ZPO where a party has either made reference to a specific document or in case it would be overly burdensome for the party seeking evidence to provide such, because it has no access to the relevant material. However, even where the rule is found applicable, only specific documents can be demanded (Zöller/Greger, ZPO (2014), § 142 n. 6). Substantive disclosure obligations may also arise from contract, tort or statutory provision.  The most important of statutory provisions pertains to claims under §§ 809, 810 BGB, which permit a claim for inspection to determine the scope of an unlawful act or to seek an accounting of profits concerning the scope of such unlawful acts. However, this procedure requires the party seeking disclosure to: (a) establish a certain likelihood of success for its main claim, and (b) make a specific demand for such evidence specifying the purpose for which evidence is sought (cf. OLG Hamburg October 19th 2000, GRUR-RR 2001, 137, 140 – PM Regler, where the application of the claimant to take evidence on the effort necessary to reverse engineer a water meter was considered an illegitimate exploratory discovery (Ausforschungsbeweis)). By contrast, exploratory discovery is explicitly rejected.

103.    This comparatively restrictive approach to obtaining evidence under the German procedural system reflects a balance of interests. This balancing takes into account that any order to provide documents puts the opponent at risk of disclosing trade secrets or other confidential information, because – as a general rule – any information presented to the court will also be made available to the opponent party. This is a direct result of the procedural guarantees contained in Art. 6 of the European Convention on Human Rights and the corresponding German Constitution, as the notion of a fair hearing inter alia comprises the admittance of the public, the conduct of an oral hearing, the equality of arms, i.e. the principle that each party must be allowed to present his case in a manner that does not put him at a disadvantage to his opponent, and the right to be heard.

104.    Whereas exceptions from a public hearing are well established under §§ 172 et seq. Act of the Constitution of Courts (hereinafter GVG), there are no statutory procedural means to exclude the opposing party from any portion of the oral hearing, as such exclusion would violate the right to a fair hearing. Despite some current efforts, such as the Düsseldorf procedure or the availment of a chartered accountant, whatever is presented to the court must also be presented to the opposing party (cf. McGuire, GRUR 2015, 424, 427 et seq. with detailed references). The protection afforded by a so-called 'confidentiality club' or an 'attorney's eyes only' privilege may be achieved on the basis of party agreement, but at present is not backed up by any statutory provisions.

105.    Against this background, it is understandable that German courts give heed to broader privileges against the inspection of documents. As both trade secrets and the right to be heard are backed up by constitutional rights, restricting access to evidence through very limited

discovery is the only means of safeguarding constitutional rights.

### C.    There Are Significant Differences Between German and U.S. Trade Secret Law In Reverse Engineering

106.    A second substantial deviation between the German and U.S. legal systems governing trade secret protection concerns their different approaches to reverse engineering (Ohly, Reverse Engineering: Unfair Competition or Catalyst for Innovation?, liber amoricum Strauss (2009), 535 et seq.; Schnell/Fresca, Reverse Engineering: Darstellung der Diskussion in der BRD und in den USA, CR 1990, 157 et seq.). The protection of trade secrets has to balance the aim of being an important driver of innovation, on the one hand, and the public interest and that of competitors in the freedom of competition, on the other. Every legislature must strike a compromise, the concept and scope of trade secret protection therefore is a policy decision.

107.    I understand that in many countries, including the U.S., the freedom to reverse engineer trade secrets embodied in a publicly available product is seen as an almost absolute limitation on trade secret protection. Thus, even where a claimant establishes trade secret misappropriation by the defendant, its remedies are limited to its injury during the period of time in which the defendant obtained a "head start" in putting a competing product (embodying the trade secret) on the market by using the trade secret information rather than merely reverse engineering the publicly available product. The U.S. view on reverse engineering, which is also predominant within the European Union, is that a party is not entitled to trade secret protection beyond the period of time a competitor could reasonably reverse engineer a product embodying the trade secret once it is freely available on the market. The method, expense and sophistication will not be decisive, as long as there is no breach of contract.

108.    By contrast, German law takes a far more restrictive approach to reverse engineering as limiting trade secret protection. As mentioned above, the test is whether an average skilled person of the relevant profession would be able to discover the information without onerous and more than obvious research. Thus, in a case where the time and effort required are substantial, reverse engineering will amount to an act of unfair competition under German law. The fact that someone has used a secret instead of engaging in independent development will be taken as an indication that the effort necessary would have been too high. Using the information is only regarded lawful if – and only if – the product displays or discloses its 'secret' in the ordinary and customary use, whereas if any effort to re-engineer is required in a literal meaning, i.e. requiring analysis and rework to determine the technical principles incorporated in the product, it will amount to unfair competition.

109.    An example from the pharmaceutical area is illustrative: the availability of the product on the market will equal public availability only if a skilled person can easily infer not only the ingredients, but also the amounts used and the weight ratio (BGH February 12th 1980, GRUR 1980 750, 751 – Pankreaplex). The mere fact that the known recipe of a medication contains readily available information, which would allow a person knowledgeable in the art to develop a similar medication, as such does not affect the secrecy of the incorporated information (cf. Gloy/Loschelder/Harte-Bavendamm, Handbuch des Wettbewerbsrechts (2010), § 48 no. 10).

110.    In practice, German law does not recognize a reverse engineering defense. It is

generally acknowledged that Germany is particularly strict on this issue, as becomes apparent from the resistance against the proposed European trade secret directive (see above E4a), in comparison to U.S. law.

## IX.   THE FRANKFURT JUDGMENT SHOULD NOT IMPACT THE PENNSYLVANIA COURT'S ASSESSMENT OF HERAEUS' TRADE SECRET CLAIM AGAINST ESSCHEM

111.   Giving effect to a decision of a foreign court means to extend its territorial effect to another jurisdiction. Such effect cannot go beyond the effect such ruling would have had in its jurisdiction of origin. The judgment of the Frankfurt court was limited in scope to only German law claims, targeting the German market. And no other nation should recognize the German judgment beyond its application to the parties and their activities in Germany.

112.   But even if the current Pennsylvania proceedings were before a German court instead, the judgment of the Frankfurt court would not have binding effect on this subsequent German litigation because it is not based on the same cause of action between the same parties. As far as the reasoning of the Frankfurt court mentions Esschem at all, it is only within the context of preliminary issues to its finding, which are not vested with any res judicata effect under German law.

113.   Insofar as the effect of the German judgment in the U.S. depends on whether reciprocity is guaranteed, if the tables were turned, the substantial policy differences between the two countries' trade secret laws require independent consideration. A German court would likely not find the U.S. judgment binding on it based on the considerable deviations in German procedural and substantive trade secret laws that I discussed earlier.

114.   Based on the foregoing analysis, it is my opinion that the judgment rendered by the Frankfurt court would have no application or binding effect on the appraisal of the alleged misappropriation of Heraeus' trade secrets in a case against Esschem before a German court. Since there could be no preclusive effect against Esschem had this same lawsuit been brought in a German court, there should be no preclusive effect in a U.S. court.

## X.   CONCLUSION

115.   This expert report reflects my opinions and expected testimony with respect to the issues I have been asked to address. I reserve the right to supplement and modify this report, if and when appropriate. Furthermore, to the extent there is any subsequent discovery that yields information relevant to the analysis contained in this report, I further reserve the right to supplement and modify this report based upon any such information.

Dated:  March 9, 2016            By:     Mary-Rose McCue McGuire

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2016, I served a true copy of Expert Witness Report of Dr. Mary-Rose McCue McGuire via email on all counsel of record for Plaintiff Heraeus Medical Gmbh by sending said email to the following address: heraeusvesschem@jonesday.com.


March 9, 2016                                    /s/      Mathew Levinstein          
                                                         Mathew Levinstein

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HERAEUS MEDICAL GMBH, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 2:14-cv-05169-CMR |
| | ) | |
| v. | ) | The Honorable Cynthia M. Rufe |
| | ) | |
| ESSCHEM, INC., | ) | Special Master David H. Marion |
| | ) | |
| *Defendant.* | ) | |

## EXPERT REPORT OF PROF. DR. MARY-ROSE McCUE McGUIRE, EXHIBIT A

### Curriculum Vitae Prof. Dr. Mary-Rose McCue McGuire, M.Jur. (Göttingen)

Chair for Private Law, Intellectual Propert Law, German & European Civil Procedure at the University of Osnabrück, Germany

### Professional Carreer

| | |
|---|---|
| 1994-1999 | Master of Laws, University of Vienna Law School (Austria) |
| 2000 | Master of German Law, University of Göttingen (Germany) |
| 2000/2001 | Freshfields, Bruckhaus, Deringer, Brussels (Belgium) |
| 2001-2003 | Research and Teaching Assistant, University of Göttingen (Germany) |
| 2003/2004 | Mandatory Court Practice at the Higher Regional Court, Vienna (Austria) |
| 2004-2009 | Research and Teaching Assistant, University of Osnabrück (Germany) |
| | Member of the Working Team of the *Study Group on a European Civil Code* |
| 2009 | Postdoctoral Lecture Qualification for Private Law, Civil Procedure, IP-law & Conflicts of Laws |
| 2010 | Appointment as Full Professor at the University of Mannheim (Germany) |
| 2015 | Transfer / Appointment as Full Professor at the University of Osnabrück (Germany) |

### Main Areas of Research

- Restructuring IP Law: Overlaps, Gaps, Interface of Private & Procedural Law
- License Contracts
- European Patent law & Trade Secrets
- European Civil Procedure & Cross Border Litigation

### Teaching Activities

- University of Mannheim / Osnabrück
  Contract Law, Civil Procedure, Arbitration Law, IP-law (Patents, Trademarks, Unfair Competition)
- Mannheim Business School
  Intellectual Property in the Innovation Cycle
- German Lawyer's Academy (DAA)
  Conflicts of Laws in IP-law; International Business Law

### Further Activities

- Managing Director of the Interdisciplinary Center for Intellectual Property (IZG)

- German Reporter to the International Association for the Protection of Intellectual Property (AIPPI)
- Board Member of the German Foundation for Intellectual Property (GRUR)
- Advisory Member of the Estonian Group for the Codification of IP-law
- Expert Opinions on European Patent Law, Trade Secrets, International Private Law & Procedure

## Distinctions and Awards

- Grant by the Austrian Society for the Furtherance of Studies Pro Scientia.
- Publication Grant for the Doctoral Thesis by the Austrian Research Association (ÖFG)
- Promotional Programm 'Fast Track – Women in Science' of the Robert Bosch Foundation.
- Publication Grant for the Professoral Thesis by the German Foundation for Intellectual Property Law (GRUR)
- First Prize for Good Legislation awarded to the Model Law on Intellectual Property

## Current Lectures and Publications

- GRUR / AIPPI Workshop Brussels, April 2015: Protecting Confidentiality of the Litigated Trade Secret
- GRUR / GPTO, April 2015: European Patent Package and national Law: On the Interplay of the Unitary Patent Regulation, Unified Patent Court Agreement and German Patent Act
- IPRB 1/2015, 7: "The Protection of Trade Secrets in the Internal Market" (with Florian Winzer)
- GRUR 5/2015, "Know-how: Orphan, troubleshooter or Cinderella? The Current Proposal of a EU-Trade Secrets Directive"
- Cologne Trade Mark and Competition Law Forum, February 2016: Know-how Protection: A comparison of German national law with the upcoming EU-Trade Secret Directive

## Full List of Publications

## Cross-Border Litigation / European Civil Procedure

1. Verfahrenskoordination und Verjährungsunterbrechung im Europäischen Prozessrecht, Veröffentlichungen zum Verfahrensrecht Band 34, (zugl. Diss. Univ. Göttingen 2003), Tübingen 2004.

2. Die materielle Prozessleitung zwischen richterlicher Hilfe und staatlicher Bevormundung: § 139 dZPO und § 182 f öZPO im Vergleich, in: *Peer/Faber* (Hrsg.), Jb. J. Zivilrechtswissenschaftler 2003, Stuttgart 2004, 99-128.

3. Anmerkung zu EuGH Rs. C-116/02, 9.12.2003 – Erich Gasser GmbH gegen Misat Srl, in: GPR 3/2003-2004, 159-162.

4. Die prozessuale Verknüpfung von nationalem und Gemeinschaftsrecht: Die Einbindung der Rechtsprechung in die Entwicklung des Referenzrahmens, in: GPR 4/2003-2004, 170-175 (gemeinsam mit *Lorenz Kähler*).

5. Prozessführungsverbot und Rechtsmissbrauch: zugleich Anmerkung zu EuGH Rs. C-159/02 – Gregory Paul Turner / Felix Fareed Ismail Grovit and Others, in: ecolex 11/2004, 916-918.

6. Die neue Enforcement Directive 2004/48/EG und ihr Verhältnis zum TRIPS-Übereinkommen, in: ÖBl 6/2004, 232-235.

7. Beweismittelvorlage und Auskunftsanspruch nach der Richtlinie 2004/48/EG zur Durchsetzung der Rechte des geistigen Eigentums – Über den Umsetzungsbedarf im deutschen und

österreichischen Prozessrecht,
in: GRUR Int 1/2005, 15-22.

8. Internationale Zuständigkeit für „isolierte Gewinnzusagen":
zugleich Anmerkung zu EuGH, Rs. C-27/02 – Petra Engler / Janus Versand GmbH,
in: ecolex 6/2005, 489-492.

9. Die EuBVO und ihre Umsetzung in das österreichische Zivilprozessrecht – Der Vorrang der
traditionellen Rechtshilfe im Spannungsverhältnis mit dem Unmittelbarkeitsgrundsatz,
in: ZZP Int 10 (2005), 81-122 (gemeinsam mit *Walter Rechberger*).

10. Forum Shopping und Verweisung:
Über die Vermeidung missbräuchlicher Prozesstaktiken im Europäischen Prozessrecht,
in: ZfRV 3/2005, 83-93.

11. Die elektronischen Urkunde und das Beweismittelsystem der ZPO,
in: *Rechberger /Stelzer* (Hrsg.), Die elektronische Revolution im Rechtsverkehr, Wien 2006, 1-
27 (gemeinsam mit *Walter Rechberger*).

12. Die europäische Beweisverordnung und Österreich,
in: ÖJZ 21/2006, 829-836 (gemeinsam mit *Walter Rechberger*).

13. Rechtsbehelfe des Schuldners gegen den EU-Vollstreckungstitel,
in: ecolex 1/2006, 83-85.

14. Die richtlinienkonforme Auslegung des § 142 ZPO:
Anmerkung zu BGH 1.8.2006 – X ZR 114/03 – Restschadstoffverwertung,
in: GPR 1/2007, 34-38.

15. Das neue Europäische Mahnverfahren:
Über das (Miss-)Verhältnis zwischen Effektivität und Schuldnerschutz,
in: GPR 06/2007, 302-307.

16. Fakultatives Binnenmarktprozessrecht:
Gemeinsame Strukturen, Überschneidungen und stillschweigende Querverweise,
in: ecolex 1/2008, 100-104.

17. *Andreas Kleinknecht*, Die verbraucherschützenden Gerichtsstände im deutschen und
europäischen Zivilprozessrecht, Münsteraner Studien zur Rechtsvergleichung, LitVerlag 2007,
in: ZfRV 1/2008, 46-48.

18. Grundfragen und aktuelle Probleme des Beweisrechts: Diskussionsbericht zur Tagung der
Vereinigung der Zivilprozessrechtslehrer vom 4.-6.April 2008 in Osnabrück,
in: ZZP 2/2008, 225-231.

19. Die dogmatische Situation des Vollstreckungsrechts unter Einschluss europarechtlicher
Entwicklungen: Diskussionsbericht zur Tagung der Vereinigung der Zivilprozessrechtslehrer
vom 4.-6.April 2008 in Osnabrück,
in: ZZP 4/2008, 503-510.

20. Diverse Lexikon-Einträge zum Europäisches Zivilprozessrecht:
in: Lachmayer/Bauer (Hrsg.), Praxiswörterbuch Europarecht, Baden-Baden 2008.

21. Kommentierung der Art. 27-31 EuGVVO (Brussels Regulation),
in: *Neumayr/Burgstaller* (Hrsg.), Europäischen Zivilprozessrecht, Orac Verlag Wien 2009

22. Jurisdiction in cases related to a licence contract under Art. 5 (1) Brussels Regulation: Case-
Note on Judgment ECJ Case C-533/07 – Falco Privatstiftung and Thomas Rabitsch v. Gisela
Weller-Lindhorst, Yearbook of Private International Law 2009.

23. Reformbedarf der Rechtshängigkeitsregel?
Ein Überblick über die im Grünbuch zur Brüssel-I-VO vorgeschlagenen Änderungen der Art

27 ff. EuGVO,
in: *Fucik/Konecny/Lovrek/Oberhammer*, Jahrbuch Zivilverfahrensrecht 10 (2010), 133-149.

24. Grenzen der Rechtswahl im Schiedsverfahren?
Über das Verhältnis von § 1051 ZPO zu Art. 3 Rom-I-VO,
in: SchiedsVZ 2011, 257-267

25. Kodifikation des Europäischen Zivilprozessrechts?
in: ecolex 3/2011, 218-222.

26. GAT-LuK Revisited:
Die internationale Zuständigkeit im Patentstreitigkeiten vor dem Hintergrund der EuGVO-Reform,
in: WRP 2011, 983-993.

27. Priorität versus Flexibilität?
Zur Weiterentwicklung der Verfahrenskoordination im Rahmen der EuGVO-Reform,
in: Reinhold Geimer/Rolf A. Schütze, Recht ohne Grenzen, Festschrift für Athanassios Kaissis zum 65. Geburtstag, München 2012, 671-681

28. Anmerkung zum Beschluss des BGH vom 27.10.2009, Az. VIII ZB 42/0,
in: ZZP 2010, 239-242.

29. Der Gerichtsstand des Erfüllungsorts nach Art. 5 Nr. 1 EuGVO bei Lizenzverträgen,
in: GPR 2010, 97-103.

30. Internationale Zuständigkeit bei Markenverletzung durch Keyword-Advertising,
Anmerkung zu EuGH 19.4.2012 – Wintersteiger/Products4U,
in: ZEuP 2014, Heft 1 , 155-172.

31. Die Europäisches Beweisverordnung, in: Leible/Terhechte (Hrsg.), Enzyklopädie Europarecht: Europäisches Rechtsschutz- und Verfahrensrecht, Band 3, Nomos Baden-Baden 2014.

## European Private Law & Conflicts of Law

32. Transfer of Title in Moveables
National Report: Germany,
Salzburger Studien zum Europäischen Privatrecht Band 17, Frankfurt am Main 2006.

33. Europäisches Privatrecht:
Über die Verknüpfung von nationalem und Gemeinschaftsrecht,
Jahrbuch Junger Zivilrechtswissenschaftler 2004, Stuttgart 2005,
(editor, in collaboration with *Andrea Tietze* u.a.).

34. Ziel und Methode der Study Group on a European Civil Code,
in: ZfRV 5/2006, 163-174
polnische Übersetzung in: *Ulrich Ernst* (Hrsg.), ‚Auf halbem Weg', Krakau 2007.

35. Die geplante Umwandlung des EVÜ in die Rom I-VO,
in: ecolex 5/2006, 441-444.

36. actio negatoria: internationale Zuständigkeit und anwendbares Recht:
zugleich Anmerkung zu EuGH 18.5.2006, Rs C-343/04 – Land Oberösterreich / CEZ a.s.
in: ecolex 08/2006, 709-712.

37. Zugang und Ausschluss als Gegenstand des Privatrechts,
Tagungsbericht 16. Tagung der Gesellschaft Junger Zivilrechtswissenschafter in Bremen 2005,
in: ÖJZ 2006, 588-590.

38. Der Gemeinsame Referenzrahmen: ein erster akademischer Entwurf,
in: ecolex 5/2008, 493-496.

39. Verjährungsunterbrechung durch Auslandsklage nach § 1497 ABGB,
    in: Zak 8/2008, 148-150.

40. Diverse Lexikon-Einträge zum Europäischen Privatrecht:
    in: Lachmayer/Bauer (Hrsg.), Praxiswörterbuch Europarecht, Baden-Baden 2008.

41. Europäische Methodik:
    Konvergenz und Diskrepanz europäischen und nationalen Privatrechts,
    Jahrbuch Junger Zivilrechtswissenschaftler 2009, Stuttgart 2010,
    (editor, in collaboration with *Christoph Busch, Christine Kopp, Martin Zimmermann*).

42. Moot Courts als Praxistest,
    in: *Schmidt-Kessel* (Hrsg.), Der gemeinsame Referenzrahmen: Entstehung – Inhalte –
    Anwendung, München 2009, 479-499.

43. Der verbraucherrechtliche Acquis Communautaire:
    Über das Verhältnis zwischen den Vorarbeiten für ein Europäisches Vertragsrecht und der
    Überarbeitung des Europäischen Verbraucherschutzrechts,
    japanische Übersetzung von *Hiruhito Takashima*,
    in: Minshôhôzasshi Bd. 140. Nr. 2., 201- 224, Nr. 3., 401- 420.

44. Konvergenz und Diskrepanz nationaler und europäischer Methodik: Der Einfluss des
    Gemeinschaftsrechts auf das äußere System des deutschen Privatrechts,
    in: GPR 2009, 150-159 (gemeinsam mit *Christoph Busch*, *Christine Kopp* und *Martin
    Zimmermann*).´

45. National Report on the Transfer of Moveables in Germany,
    2. überarbeitete Auflage, in: *Faber/Lurger* (Hrsg.),
    National Reports on the Transfer or Moveables in Europe, Band II,
    München 2010.

46. Das Urheberrecht in der Cloud
    in: *Leible/Ohly*, Der Schutz des Geistigen Eigentums im Internet, Tübingen 2012, 143-164

47. Art. 8 Rom II VO, in Wurmnest u.a.(Hrsg.), Beck Online-Großkommentar, München 2016 (*in
    print*)


**Intellectual Property & Trade Secret Law**

48. Die Lizenz:
    Eine Einordnung in die Systemzusammenhänge von BGB und Zivilprozessrecht
    (zugl. Habilitation Univ. Osnabrück 2009),
    Ius Privatum, Tübingen 2012.

49. Modellgesetzbuch für Geistiges Eigentum:
    Normtext mit Einleitung und Synopse,
    München 2011 (gemeinsam mit *Hans-Jürgen Ahrens*).

50. Modellgesetzbuch für Geistiges Eigentum:
    Normtext und Begründung,
    München 2012 (gemeinsam mit *Hans-Jürgen Ahrens*).

51. Modell Law on Intellectual Property:
    abbreviated English edition, München 2012 (trasnlation in collaboration with *Jasmin Jaenisch*).

52. Kapitel 22 – Geistiges Eigentum,
    in: *Gebauer/Wiedmann* (Hrsg.), Zivilrecht unter Europäischem Einfluss,
    Stuttgart 2010, 1085-1204.

53. Verträge über Schutzrechte des geistigen Eigentums (Übertragung und Lizenzen) und dritte Parteien (AIPPI-Landesbericht Q 190)
in: GRUR Int 2006, 682-696 (gemeinsam mit *Ludwig von Zumbusch* und *Björn Joachim*).

54. Anmerkung zu Cour de Cassation (Chambre de Commerce), 5. April 2005 – Schadenersatzanspruch des einfachen Lizenznehmers für entgangenen Gewinn nach österreichischem Recht, in: ERPL 2006, 806-816.

55. Intellectual Property Rights: "Property" or "Right"?
On the Application of the Transfer Rules to Intellectual Property;
in: *Faber/Lurger* (Hrsg.), Rules for the Transfer of Movables – A Candidate for European Harmonization or National Reform?, München 2007, 217-237.

56. Der Einfluss der Mitinhaberschaft an Rechten des Geistigen Eigentums auf deren Verwertung (AIPPI Landesbericht Q 194),
in: GRUR Int 6/2007, 503-509 (gemeinsam mit *Volker Henke* u.a.).

57. *Christoph Nolden*, Das Abstraktionsprinzip im urheberrechtlichen Lizenzverkehr, Schriften zum deutschen und internationalen Persönlichkeits- und Immaterialgüterrecht, Band 13, V&R Unipress,
in: UFITA III/2007, 861-865.

58. Die Funktion des Registers für die rechtsgeschäftliche Übertragung von Gemeinschaftsmarken, in: GRUR 1/2008, 11-18.

59. Die geographische Herkunftsangabe im Gemeinschaftsrecht: Über systematische Unterschiede der VO (EG) Nr. 510/2006 im Vergleich zum deutschen Recht,
in: WRP 5/2008, 620-628.

60. Der Einfluss der Mitinhaberschaft an Rechten des Geistigen Eigentums auf deren Verwertung (AIPPI- Landesbericht Neubearbeitung der Frage Q 194; Fortsetzung von GRUR 2007),
in: GRUR Int 2009, 818-826 (gemeinsam mit *Volker Henke* u.a.).

61. Der Schutz von Geschäfts- und Betriebsgeheimnissen durch Rechte des Geistigen Eigentums und das Recht des unlauteren Wettbewerbs (AIPPI Q 204),
in: GRUR Int 2010, 829-840 (gemeinsam mit *Björn Joachim* und *Klaus Haft*).

62. Geografische Herkunftsangaben (Art. 22-24 TRIPS),
in: *Busche/Stoll/Wiebe* (Hrsg.), TRIPS: Internationales und europäisches Recht des Geistigen Eigentums,
2. Auflage, Köln 2013, 365-460.

63. Schadenersatz für Verletzung, Fälschung und Piraterie von Marken,
in: GRUR Int 10/2008, 923-934 (gemeinsam mit *Christian Donle* u.a.).

64. Nutzungsrechte an Computerprogrammen in der Insolvenz: zugleich eine Stellungnahme zum Gesetzesentwurf zur Regelung der Insolvenzfestigkeit von Lizenzverträgen,
in: GRUR 1/2009, 6-13.

65. Kumulation und Doppelschutz:
Ursachen und Folgen des Schutzes einer Leistung durch mehrere Schutzrechte,
in: GRUR 2010, 767-774.

66. Ein Binnenmarkt für Geistiges Eigentum:
Erreichte Harmonisierung, Status Quo, Reformvorhaben,
in: MarkenR 2011, 438-447.

67. Lizenzen in der Insolvenz:
Ein neuer Anlauf zu einer überfälligen Reform,
in: GRUR 2012, 657-664.

68. Community Trademarks as Objects of Property (Art. 16-24 CTMR), in Hasselblatt (Ed.), Community Trade Mark Regulation, München/Oxford 2015.

69. Related Actions in Community Design Matters (Art. 95-96), in: Hasselblatt (Ed.), Community Trade Mark Regulation, München/Oxford 2015.

70. Rechtsdurchsetzung: durch materielles und Verfahrensrecht,
Festschrift für Hans-Jürgen Ahrens,
Köln u.a. 2016 (editor, in collaboration with Wolfgang Büscher u.a.).

71. Verbraucherschutz durch Geistiges Eigentum?
Über die Zweckmäßigkeit den Schutzzweck zu erweitern,
in: ZGE 2012, 259-283 (gemeinsam mit *Sofia Wagner*).

72. Die Patentlizenz im System des BGB,
in: MittdtPatAnw 2013, 207-215.

73. Anmerkung zum Urteil des OLG München vom 25.07.2013 (Insolvenzfestigkeit einfacher Nutzungsrechte),
in: GRUR 2013, 1125-1134.

74. Sukzessionsschutz und Fortbestand der Unterlizenz nach M2TRade und TakeFive – ein Lösungsvorschlag,
in: GRUR 2014, 28-35 (gemeinsam mit *Jens Kunzmann*).

75. IP licensing and insolvency (Q241),
in: GRUR Int. 2014, 928-939 (gemeinsam mit *Lea Tochtermann, Jan Dombrowski, Clemens Heusch, Oliver Scherenberg, Christian Stoll*).

76. Der Schutz von Geschäftsgeheimnissen im Binnenmarkt,
in: IPRB 2015, 7-12 (gemeinsam mit *Florian Winzer*).

77. Know-how: Stiefkind, Störenfried, Sorgenkind?,
in: GRUR 2015, 424-436.

78. AIPPI Q 247: Trade secrets: Overlap with restraint of trade, aspects of enforcement, in: GRUR Int 2015, 932 (gemeinsam mit Heusch u.a.)

79. Monismus: ein Irrweg?,
in: Dreier/Hilty (Hrsg.), Vom Magnettonband bis Social Media,
Festschrift 50 Jahre Urheberrechtsgesetz (2016), 289-304.

80. European Patent Package:
Das Zusammenspiel von EPVO, EPGÜ und nationalem Patentrecht,
Mitteilungen der deutschen Patentanwälte 2015, 537-547.


## Translations

81. *Christian von Bar*, Principles of European Law. Benevolent Intervention in Another's Affairs. München 2006 (gemeinsam mit *Stephen Swann*).

82. AIPPI German National Report on Q 190:
Contracts regarding Intellectual Property Rights (assignment and licenses) and third parties,
in: AIPPI Yearbook 2006, 417-422.

83. AIPPI German National Report on Q 194:
The impact of Co-Ownership of Intellectual Property Rights on their Exploitation
in: AIPPI Yearbook 2007, 197-208.

84. AIPPI German National Report on Q 203:
Damages for infringement, counterfeiting and piracy of Trademarks,
in: AIPPI Yearbook 2008, 223-237.

85. AIPPI German National Report on Q 194 BA (Further Issues):
The impact of Co-Ownership of Intellectual Property Rights on their Exploitation,
in: AIPPI Yearbook 2009, 212-226.

**Previous Retention as Expert**

List of all other cases in which, during the previous 4 years, Dr. Mary-Rose McCue McGuire has acted as an expert at trial:

1. 2012: Bavarian and Dutch beer brewers on an issue of geographical indications in a trademark case;
2. 2013: US pharmaceutical company versus a German pharmaceutical company (none involved in current dispute) on the applicable law to a license contract/patent invalidity; and
3. 2014: Israeli company on the jurisdictional venue and concurring proceedings (lis pendens, abuse of law) in a patent infringement case.
4. 2015: US and German airline industries on the applicable law to a patent and trade secret licence agreement and the validity of granted sub-licence.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERAEUS MEDICAL GMBH, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 2:14-cv-05169-CMR |
| | ) | |
| v. | ) | The Honorable Cynthia M. Rufe |
| | ) | |
| ESSCHEM, INC., | ) | Special Master David H. Marion |
| | ) | |
| *Defendant*. | ) | |

## EXPERT REPORT OF PROF. DR. MARY-ROSE McCUE McGUIRE, EXHIBIT B

Judgment (German original)
Landgericht Darmstadt, 20 December 2012 – 3 O 493/08
Hereaus Kulzer GmbH (plaintiff) gegen Biomet Deutschland GmbH u.a.

Judgment (German original and translation)
Oberlandesgericht Frankfurt am Main, 12. June 2014 – 6 U 15/13 Hereaus Kulzer GmbH gegen
Biomet Deutschland u.a.

Judgment (German original)
Landgericht Frankfurt am Main, 13. May 2009 – 2-06 O 545/08 Biomet Orthopaedics
Switzerland gegen Hereaus Kulzer GmbH

Judgment in the preliminary relief proceedings
District Court of Rotterdam, 11 February 2015 – C/10/467438 / KG ZA 15-12 Biomet Europe
B.V. (plaintifft) versus Heraeus Drijfthout B.V. (defendant)

Judgment in the preliminary relief proceedings
District Court of Rotterdam, 11 February 2015 – C/10/46/464628 / KG ZA 14-1131 Hereaus
Medical GmbH (plaintiff) versus Biomet Europe B.V. (defendant)

Order (German original)
Commercial Court Vienna, 8. September 2015
Hereaus Medical GmbH (applicant) gegen Biomet Austria GmbH und Renaat Vermeulen

Hereaus' Complaint before the
District Court for the Eastern District of Pennsylvania 14 August 2014 Hereaus Medical GmbH
(Plaintiff) v. Esschem Inc. (Defendant)

Defendant Esschem Inc.'s Surreply before the
District Court for the Eastern District of Pennsylvania 7 October 2014 Hereaus Medical GmbH
(Plaintiff) v. Esschem Inc. (Defendant)

Defendant's Memorandum of Law in Support of its Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint before the
District Court for the Eastern District of Pennsylvania 2 October 2014
Hereaus Medical GmbH (Plaintiff) v. Esschem Inc. (Defendant)

Defendant Esschem, Inc's Surreply in Opposition to Plaintiff Heraeus Medical GmbH's Motion for Temporary Restraining order before the
District Court for the Eastern District of Pennsylvania 7 October 2014
Hereaus Medical GmbH (Plaintiff) v. Esschem Inc. (Defendant)

Defendant Esschem Inc's Reply to Plaintiff's Response to Esschems's Rule 12(b)(6) Motion before the
District Court for the Eastern District of Pennsylvania 24 October 2014
Hereaus Medical GmbH (Plaintiff) v. Esschem Inc. (Defendant)

Defendant Esschem Inc's Memorandum on why the German Appelate Court Judgment has no collateral Estoppel Effect before the
District Court for the Eastern District of Pennsylvania 3 November 2014
Hereaus Medical GmbH (Plaintiff) v. Esschem Inc. (Defendant)

Second Declaration of Dr. Friedrich Klinkert 22 September 2014

Fourth Declaration of Dr. Friedrich Klinkert 20 May 2009


Expert Report of Dr. Stuart Cooper 9 March 2016